BIG CREEK GAP COAL & IRON CO. et al. v. AMERICAN LOAN & TRUST CO.

(Circuit Court of Appeals, Sixth Circuit.    February 13, 1904.)

No. 1,214.

1. CORPORATIONS—MORTGAGE—DEFENSE BY STOCKHOLDERS.

Where stockholders of a corporation intervene in a foreclosure suit against it for the sole purpose of contesting the validity of the mortgage, they must stand upon the right of the corporation itself.

2. APPEAL—REVIEW OF FINDINGS OF FACT.

A very plain showing of mistake or error must be made to authorize an appellate court in an equity cause to reverse findings of fact made by a master and affirmed by the trial court.

3. CORPORATIONS—MORTGAGE—DEFENSE BY STOCKHOLDERS.

Bondholders of a corporation deposited their bonds with a trustee, taking a receipt therefor, which recited that they were deposited under and subject to a plan of reorganization, a copy of which was held by the trustee, and to the terms of which they assented by accepting the receipt. Such plans provided that they should receive preferred stock in the new company, and authorized such company to issue bonds secured by mortgage, which it did for money and property needed in prosecuting its business. *Held*, that they could not impeach the validity of such mortgage on the ground that they were fraudulently induced to believe that no bonds were to be issued, unless it was shown that the holder of the bonds was a party to such fraud.

4. SAME—VALIDITY OF MORTGAGE—TENNESSEE STATUTE.

Under the statute of Tennessee which authorizes a corporation to execute a mortgage to secure borrowed money, a mortgage executed to secure bonds issued in payment of an obligation incurred in the purchase of property is not ultra vires, being in practical effect the same as though issued for money borrowed to pay such obligation.

5. SAME—ESTOPPEL.

A corporation which has executed a mortgage and issued bonds, and obtained therefor money and property, which it retains, is estopped to set up an irregularity in the manner of executing the mortgage to defeat the same.

Appeal from the Circuit Court of the United States for the Eastern District of Tennessee.

The following is the opinion of the Circuit Court, by CLARK, District Judge:

In the treatment and disposition of a case like the one at bar, the distinction between the entirely separate legal identity of the corporation and its rights, and of the stock and shareholder and his rights, must never be forgotten. The separate and distinct property and rights of the corporation and those of the shareholder give rise to distinct obligations and liabilities in respect to those separate rights and property.

A question which suggests itself at once is whether or not the defendants who have intervened, and who are defending against this foreclosure suit, are permitted to set up a defense on behalf of the corporation, and such as the corporation itself, acting in good faith, could present, or whether they are permitted to assert as a defense any fraud or wrong practiced upon them as individuals and separate shareholders by virtue of rights which belong to them as such shareholders, as distinguished from the corporation. It has been long settled and well understood that, when stockholders bring suit on behalf of a corporation against third persons to assert corporate rights, the remedy is such as the corporation itself only could avail itself of, if acting in good faith and with proper diligence, and the separate or individual rights of the stockholders

cannot be presented or considered in such a suit; and when such a suit is brought it must be one which inures to the benefit of the corporation itself directly, and to all the stockholders as a class indirectly. This is for the obvious reason that the separate and individual rights of the shareholders may be different and distinct, and one shareholder may have suffered an injury which does not affect the other shareholders, or which may affect them favorably as between themselves as shareholders. Now, does the same rule apply when shareholders on a proper showing are permitted to intervene to defend on behalf of the corporation, upon showing that such corporation itself is failing to make the proper defense? A proper understanding of the answer to this question will avoid confusion in a case like the one at bar. The entirely separate and distinct identity of the rights and remedies of the corporation itself and these separate and individual shareholders has been often stated and restated, and it is quite sufficient to refer to some of the leading cases: Bronson v. La Crosse Railroad Co., 2 Wall. 283, 17 L. Ed. 725; Davenport v. Dows, 18 Wall. 626, 21 L. Ed. 938; Church v. Citizens' St. R. Co. (C. C.) 78 Fed. 526; Forbes v. Memphis R. Co., Fed. Cas. No. 4,926. This distinction and its consequences, as respects the proper remedy, is elaborately pointed out by Mr. Justice Bradley in the Forbes Case, and quite clearly by Judge Baker in Church v. Citizens' St. R. Co. (C. C.) 78 Fed. 526, in which last case it was held, and properly, of course, that rights which belong to the individual shareholders and those which belong to the corporation cannot be joined.

Much of the discussion at bar has been devoted to the proposition that these interveners were deceived and defrauded in regard to the scheme of reorganization pursuant to which the bonds in question were issued. Their contention in this behalf is that the fact of a bond issue was concealed from them, and that by such concealment they were induced to surrender bonds held against the old company, and to take in exchange therefor preferred stock in the defendant Cumberland Coal & Iron Company. Whether or not the court may consider this element in the case depends upon the answer to the inquiry whether or not these interveners are limited in their defense to such objections as would be open to the defendant mortgagor corporation in this suit, or whether their separate and individual rights may be considered. The very recent case of Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423, is in this regard undistinguishable from the case at bar. In that case Mr. Justice Brown, in relation to this question, speaking for the court, said: "This case presents primarily the question whether a minority of the stockholders of a corporation have a right to intervene, in the foreclosure of a mortgage upon the corporate property, for the purpose of showing that the property was sold to the corporation by the connivance of the mortgagees at a gross overvaluation, and to compel the bonds held by them to be subjected to a set-off of their indebtedness to the corporation for unpaid stock. It should be borne in mind, in connection with the several defenses set up by the interveners, that they do not appear here in the capacity of creditors, but as stockholders; that their rights are the rights of the corporation, and must be asserted and enforced through the corporation; and upon the theory that the latter has or threatens, by collusion or otherwise, to neglect the proper defense of the foreclosure suit. Dodge v. Woolsey, 18 How. 331, 341, 343 [15 L. Ed. 401]; Koehler v. Black River Falls Iron Co., 2 Black, 715 [17 L. Ed. 339]; Bronson v. La Crosse, etc., Railroad, 2 Wall. 283 [17 L. Ed. 725]; Davenport v. Dows, 18 Wall. 626 [21 L. Ed. 938]; Dewing v. Perdicaries, 96 U. S. 193 [24 L. Ed. 654]; Hawes v. Oakland, 104 U. S. 450, 460 [26 L. Ed. 827]; Greenwood v. Freight Co., 105 U. S. 13 [26 L. Ed. 961]; Detroit v. Dean, 106 U. S. 537 [1 Sup. Ct. 560, 27 L. Ed. 300]; Cook on Stockholders, §§ 645, 659, 750." The question has been fully considered in its practical phases and application in the several cases cited by Mr. Justice Brown. See, also, Cook on Corporations, § 848, where the same principle will be found laid down as applicable to foreclosure suits. The defendants are consequently limited to such objections to the mortgage and bonds as might have been urged by the defendant corporation itself, the mortgagor, and they cannot in this suit assert, or influence the result by asserting, any wrong to them as individual shareholders. Indeed, it may be inferred on this record that all other shareholders are satisfied with the situation as it is, and would offer no objection to this suit if offered an op-

portunity to do so. It is conceivable that in a given case the rights and interests of the separate shareholders might be different, and any defense which may be offered in a suit like this must be one which avails directly to the corporation, and indirectly to all the shareholders alike. In determining the case, therefore, I am constrained to hold that the defendants are limited in the defense to such objections as would be open and available to the mortgagor company itself in an answer setting up all valid objections which might be set up by the mortgagor. The observation, not necessarily called for, may be made that these interveners have brought no independent suit, and have presented no cross-bill asking any affirmative relief. The organization scheme has been fully executed, and stock delivered to them pursuant to their agreement, and they are now holding said stock and exercising the rights of shareholders by their petition of intervention in this case. This is all in affirmance of the contract of reorganization as executed, and is manifestly inconsistent with the claim and objection that they were defrauded by the plan of reorganization, as it would be manifestly antagonistic to say that they were defrauded, and the scheme of reorganization invalid, while they still hold to the results which have come to them from the execution of such a contract. Davis v. Peabody, 170 Mass. 397, 49 N. E. 750; Savings & Trust Co. v. Bear Valley R. R. Co. (C. C.) 112 Fed. 693. If the rights of these interveners as members and shareholders, and any fraud practiced on them as distinguished from a fraud practiced upon the company, could be considered and determined in this suit, it is extremely probable that such rights would have to be presented by a cross-bill, and that they are not available simply in an answer, and this point may be suggested, but it is not necessary to be decided. Green v. Turner (C. C.) 80 Fed. 41; Springfield Milling Co. v. Barnard & Leas Mfg. Co., 81 Fed. 261, 26 C. C. A. 389; Meissner v. Buek (C. C.) 28 Fed. 161. See, also, the closing observations of Mr. Justice Bradley in the Forbes Case already referred to.

But I pass at once to the consideration of such objections as can properly be made on behalf of the mortgagor company itself, taking them up in the order in which I find them disposed of by the special master.

1. It is objected that the execution of the mortgage securing the bonds in question was ultra vires, because not executed as security for borrowed money, nor to secure bonds issued or indorsed to raise money for railroad stock subscriptions by the mortgagor company, and, as supporting this contention, sections 2054–2057 and section 2339 of Shannon's Revisal are cited. It will be observed by an inspection of the statutes carried into these sections that, under subdivision 3 of section 2054, express power is conferred upon the corporation, without limitation, to purchase and sell and convey real estate for "corporation purposes." This provision is simply declaratory of the common law, as we shall presently see. All corporations, at the common law, possess the power to purchase and hold property, real and personal, and to convey, in mortgage or otherwise, such property for any corporation purposes, keeping in view the ordinary prosecution of the business for which the corporation was organized. And so, too, subdivision 7 of the same section, expressly authorizing a mortgage or mortgages on the corporation property as security for the repayment of money borrowed, is merely declaratory of the common law, and this section undoubtedly carries the implied common-law limitation that the money must be borrowed, the debt created, and the mortgage executed for a corporation purpose, and fairly within the scope of the objects for which the corporation was created. In regard to strictly private business corporations, experience had made it manifest to the Legislature that this implied limitation on the power to create a debt and execute a mortgage at the common law was somewhat too restrictive to enable many corporations to prosecute their business and develop and utilize their properties to the best advantage, having due regard to more modern commercial conditions. In regard to mining companies in particular, it had been found that many of the most valuable properties were so situated as to be without the means of transportation afforded by railway. The products of mines were such that any method of transportation, other than railway, was wholly inadequate to the proper operation of such mines. Notwithstanding this obvious fact, it was regarded doubtful whether under the common-law power the company could extend aid to a railroad to enable it to obtain proper means of transportation, so necessary to success, and it was to

remove this doubt and to enlarge its common-law power that the act of 1873, carried into Shannon's Revisal at section 2339, was enacted, by which the corporation was enabled, upon a three-fourths vote of its stock, "to subscribe for, purchase, hold or dispose of stock in any railroad company whose line of road shall be contiguous to the works of such company, or so near thereto as to be used by them in carrying on their necessary operations." It results from this view that a mining company, under the law of Tennessee, besides its common-law power, is also vested with the power conferred by the act of 1873, and that act can in no proper way be regarded as a limitation upon the common-law power of such a company. The bonds secured by the mortgage now in question were executed, secured, and delivered in part payment for corporate property, without which the corporation could not carry on its business at all, and could not accomplish the purposes of its creation. And I may say just here, once for all, that, so far as a railroad could be regarded as an element in the corporation property thus purchased, it was a mere incident, and there is no basis in the real facts of the transaction for the contention that this is a mortgage executed pursuant to the powers conferred by the act of 1873, Shannon's Revisal, § 2339, hereinbefore referred to. The mortgage and bonds, having been executed for the purchase of necessary corporate property, were not ultra vires, but intra vires, and within the common-law power authority of the corporation. Jones v. Guaranty Co., 101 U. S. 622, 25 L. Ed. 1030; Central Trust Co. v. Columbus, H. V. & T. Ry. Co. (C. C.) 87 Fed. 815; Hunt & Bro. v. Memphis Gas Light Co., 95 Tenn. 137, 31 S. W. 1006; The White Water Valley Canal Co. v. Vallette et al., 21 How. 414, 16 L. Ed. 154; 7 A. & E. Encycl. of L. (2d Ed.) pp. 719, 738, and 771, and cases there collated.

It must be borne in mind that the mortgagor corporation was not a public, or quasi public, corporation, and there rested upon it no public duty to perform, and which it might disable itself from performing by the conveyance, in mortgage or otherwise, of its corporate property. It was a purely private corporation, organized distinctly for individual profit. In the late case of Jacksonville, etc., Railway v. Hooper, 160 U. S. 514, 16 Sup. Ct. 379, 40 L. Ed. 515, the Supreme Court, at page 525, 160 U. S., page 383, 16 Sup. Ct., 40 L. Ed. 515, expressed its views by quoting for that purpose the language of an English case, which was as follows: "This doctrine ought to be reasonably, and not unreasonably, understood and applied, and whatever may fairly be regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not, unless expressly prohibited, to be held, by judicial construction, to be ultra vires." Many other cases are cited in the opinion which are pertinent to the question of corporate power here involved, and in the subsequent case of Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265, Mr. Chief Justice Fuller, giving the opinion of the court, and referring again to this distinction between public and purely private corporations, said: "The general rule is that a contract by which a railroad company renders itself incapable of performing its duties to the public, or attempts to absolve itself from those obligations without the consent of the state, or a contract made by a corporation beyond the scope of its powers, express or implied, on a proper construction of its charter, cannot be enforced or rendered enforceable by the application of the doctrine of estoppel. Thomas v. Railroad Co., 101 U. S. 71 [25 L. Ed. 950]; Central Transportation Co. v. Pullman Car Co., 139 U. S. 24 [11 Sup. Ct. 478, 35 L. Ed. 55]. But where the subject-matter of the contract is not foreign to the purposes for which the corporation is created, a contract embracing 'whatever may fairly be regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not, unless expressly prohibited, to be held by judicial construction to be ultra vires.' Jacksonville Railway Co. v. Hooper, 160 U. S. 514, 525 [16 Sup. Ct. 379, 40 L. Ed. 515]; Attorney General v. Great Eastern Railway, 5 App. Cas. 473, 478; Brown v. Winnisimmet Company, 11 Allen, 326, 334. * * * Ability to perform its own immediate duties to the public is the limitation on its jus disponendi we are considering, and that limitation had no application to such a use as that in question." The court then expressly points out that the leading cases of Thomas v. Railway Company, 101 U. S. 71, 25 L. Ed. 950, and other cases of that class, "arose upon instruments which dispossessed the corporations of all their property, and of all capacity to perform

their public duty," "but" (the court continued) "we have no such case here." If we bear now closely in mind the conclusion that the issuance of these bonds and the execution of the mortgage were acts not ultra vires, but intra vires, the power of the corporation, the proper determination of the remaining issues becomes less difficult.

2. The second contention presented by the defense is that the execution of the bonds and mortgage in question was not authorized at a proper and validly called meeting of the stockholders, and that the same was a fraud upon the company. It may here, for the sake of clearness, be restated that I conclude, as already indicated, that any fraud alleged to have been practiced upon the stockholders as individual stockholders, and not upon the corporation as well, is a question that cannot be raised, and is not open to consideration, in this proceeding. And whether or not the corporators, who are constituted by law the first board of directors, and vested with power to act until the board of directors are regularly selected by the stockholders themselves, could execute bonds and a mortgage as security for the payment of such bonds under the circumstances disclosed in this case, I do not find necessary to decide. I conclude, as I have said, and this without difficulty, too, that the execution of the mortgage and bonds was within the power of the corporation, and if so, whether or not it was regularly executed, and by the proper corporate officers or management, is a question not open on the facts disclosed by the record in this case. This defense cannot be made on behalf of the corporation, unless it is a defense which the corporation itself could make, as I have already undertaken to point out. These bonds were issued, and the mortgage securing their payment was executed, April 2, 1898, and their issuance and the execution of the mortgage had been authorized June 24, 1897, at a stockholders' meeting. The mortgagor company, and its officers and directors, with the undoubted knowledge of all of its stockholders, has from that time until this held the property conveyed to it as the consideration for said mortgage and bonds, and a large amount of stock, common and preferred. The mortgagor company has treated the property during all this interval of time as its own in every respect, and has never sought in any way whatever to question or repudiate the contract of purchase by which it became vested with the title to such property, and no stockholder or stockholders, on behalf of the company, has or have ever, by any appropriate proceedings, called in question the validity of the mortgage and bonds, or the stock, common and preferred, issued in payment for the mining property purchased from the La Follette Company. The stockholders must be charged with such knowledge as would have come to them in the exercise of due diligence and attention to their business interests, and in this case to business interests of very large magnitude. Bailey v. Tillinghast, 40 C. C. A. 93, 99 Fed. 801; Mary D. Synnott et al. v. Cumberland Building Loan Association, 117 Fed. 379, 54 C. C. A. 553, and cases referred to more at length by Judge Lurton; Johnston v. Standard Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480; Foster v. Mansfield, Coldwater, etc., Railroad, 146 U. S. 88, 13 Sup. Ct. 28, 36 L. Ed. 899; Johnson v. West India Transit Co., 156 U. S. 618, 15 Sup. Ct. 520, 39 L. Ed. 556; Willard v. Wood, 164 U. S. 502, 17 Sup. Ct. 176, 41 L. Ed. 531; Bispham's Principles of Equity (6th Ed.) §§ 259, 260, and many cases collated in the notes; Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265; Eureka Co. v. Bailey & Co., 11 Wall. 488, 20 L. Ed. 209; Railway Companies v. Keokuk Bridge Co., 131 U. S. 371, 9 Sup. Ct. 770, 33 L. Ed. 157. It is quite plain, I think, upon the most obvious principles of justice and public policy, that the right to impeach the transaction, as a part of which the bonds and mortgage were issued, on the ground of any supposed fraud, or on the ground of any irregularity, or lack of authority on the part of the board of directors acting at the time, has been lost by ratification or confirmation in retaining and dealing with the property without complaint or suit, and by acquiescence and delay such as a court of equity should under no circumstances sanction or encourage. The authorities just referred to are ample authority for the support of this position, stated broadly.

Much of the discussion at bar was devoted to the proposition that a fraud was practiced upon the company in the schemes of reorganization, but this clearly could only be asserted by treating the shareholders who now complain

of that plan of reorganization and their interests as identical with those of the company and the other bondholders and stockholders. There is no basis whatever in the record for the suggestion that the directors and officers who acted on behalf of the company in the execution of the plan of reorganization, and in the execution of the bonds and mortgage as a part thereof, were at any time misled, or that any fact was concealed from them while acting as and for the corporation. Indeed, the very objection now made is that these officers and directors so acting concealed the bond and mortgage feature of their plan from the intervening stockholders, who now defend; but if that proposition of fact be established, it makes no case of fraud upon the company, but upon the intervening shareholders, and will constitute ground on which they might seek to set aside their contract or agreement to surrender bonds and take preferred stock in the defendant Cumberland Coal & Iron Company, if good ground for relief at all. There is, however, no sort of basis in the record for saying that the Cumberland Coal & Iron Company was misled or defrauded, and the fraud which may be set up to defeat the foreclosure of the mortgage must, as the books show (2 Jones on Mortgages, § 1492; Wiltsie on Mortgage Foreclosures, § 356), be a fraud upon the mortgagor company, and not upon some one else. The mortgagor company could only have been defrauded or misled by misleading and defrauding the officers who were at the time acting for it in the execution of the mortgage and the issuance of the bonds, and, however much one or more shareholders may have been misled, and induced thereby to surrender bonds and take stock in the new company, this would be no concealment and no fraud of which the mortgagor company could complain.

The special master has treated these several issues, and the evidence as well as the law in relation to them, separately and very fully and satisfactorily, and it is deemed sufficient to refer more at length to his report, and the discussion of the case as there found. In my view of the case, as is already apparent, the shareholders cannot, in this case, complain of anything which affected them as such as distinguishable from the corporation, and this somewhat limits the scope of the discussion and decision which I find necessary in the case. In this view I do not find it necessary, as already indicated, to determine the point made on the power of the first board of directors to execute this mortgage securing the bonds in suit. Nor do I find it necessary to decide any point in relation to the separate rights of the intervening shareholders as such, and as distinguished from the rights of the corporation. Apparently the reasoning and conclusions of the special master took a somewhat wider range, both upon the law and the facts. So far, however, as he finds the facts, I concur with him in his result, and confirm the report, including his finding that these interveners were not, at the time of entering into the reorganization contract, informed of the bond and mortgage feature. His finding in this respect is well warranted, in view of the fact that La Follette did not procure their signatures to that contract, as was clearly contemplated originally, although he claims to have had the contract present with him at the meeting in Kentucky. All the exceptions to the special master's findings of facts on both sides are overruled, and his report confirmed, and, as already apparent, I concur with him in his views of the law applicable to the facts found by him, to the extent that I find it material to decide these questions of law under the somewhat more limited range of the questions which it is permissible to entertain and decide in my view of the case.

Discussion was also directed to the proposition that there was a gross overvaluation of the property for which the bonds and common and preferred stock were issued, but no creditor is here complaining of that transaction, and I need hardly repeat that my conclusion that the corporation has estopped itself to call in question the bonds or mortgage on other grounds is equally applicable to this point. The corporation clearly cannot retain the property and treat it as its own, and in the same breath insist that the transaction by which it acquired the property is fraudulent and void, and if it could do so this is relief which would require a cross-bill to render it available.

The plaintiff's counsel in argument made the point that the defendant's exceptions to the special master's report are not sufficiently specific and definite, under the rules, to raise the questions sought to be raised, and they should be overruled for this reason, but I have concluded to treat the exceptions as sufficient, and have concluded to overrule them on their merits.

So, too, the point was made in argument that the issue as to the validity of these bonds for want of a three-fourths vote of the stockholders was not set up or raised by the answer, or by proper exceptions before the master, and also that the question of overvaluation of the property for which the bonds and stock were issued was not raised by the answer, and it is very doubtful if either of these questions is properly raised. But treating them, for the purposes of this case, as presented, and as calling for a decision, my opinion is that the objections are not sound, considered upon their merits and treated as raised by the answer.

It has occurred to me, on a study of the case, that the defendants, on behalf of the corporation, are undertaking to present inconsistent defenses in this answer, in this: First, they insist that the bonds and mortgage are invalid, because not given for money borrowed at the time, and because not given in aid of a railroad, these being the only objects, it is said, for which bonds secured by mortgage are authorized; and, second, this is followed immediately by the contention that the mortgage and bonds were in fact executed in aid of a railroad as the object, and that they are invalid for want of the requisite three-fourths vote of the stock. These are both affirmative defenses in their nature, and, while it is permissible for a defendant in equity to set up in his answer any number of consistent defenses, it is probably the true rule at this day that defenses in an answer must not be inconsistent with each other, nor with the general denials of the answer, and that, if so, their benefit is for that reason lost—that is, on account of repugnancy. 1 Bates on Federal Equity Procedure, § 311, and cases there cited. I have, however, treated the defendants as at liberty to urge both of these inconsistent defenses, and have concluded that neither of them are well taken, or sufficient to defeat the bill.

It results that the bill for foreclosure is sustained, and the usual decree thereon allowed.

As I do not consider or decide anything in relation to the separate and individual rights of the intervening stockholders, the decree may provide, if thought necessary, that it is without adjudication of and without prejudice to any right which may be asserted by them as individual shareholders, as distinguished from the rights of the corporation. I think they would probably find difficulty in getting along with any suit which is conceivable in their behalf, in view of the Bailey, Synnott, and other Cases, but nevertheless, as the opinion shows that I do not consider or decide such rights in this case, the decree may expressly leave questions in that regard open, if so desired.

Ingersoll & Peyton (Henry H. Ingersoll, of counsel), for appellants.

Jourolmon, Welcker & Hudson (Leon Jourolmon, of counsel), for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit brought by the American Loan & Trust Company (which we shall call the Trust Company) against the Cumberland Coal & Iron Company (which we shall term the Cumberland Company) to foreclose a mortgage or deed of trust on its coal, iron, and timber property in Tennessee, given to secure $440,000 of its bonds. The Cumberland Company answered, admitting it was insolvent and in default, and conceding the mortgage should be foreclosed. The appellants, the Big Creek Gap Coal & Iron Company (hereafter designated the Big Creek Company) and certain individuals, owners of about $275,000 of the preferred stock of the Cumberland Company, intervened, and, as stockholders, resisted the foreclosure, claiming (1) that the mortgage was ultra vires, (2) that it was unauthorized, and (3) that it was executed in fraud of their rights. The case was referred to a master, who, in an elaborate report, in which he carefully compared and considered the conflicting evidence introduced,

found against the interveners, both upon the facts and the law. The case came before the court below upon exceptions to this report. In a well-considered opinion the findings of the master were sustained and a decree of foreclosure granted. From this the interveners have appealed.

The charge of fraud grows out of the reorganization of the La Follette Coal & Iron Company (hereafter called the La Follette Company). The Big Creek Company was organized in 1888. It was the owner of a part of the mineral lands covered by the mortgage in question. Upon these lands it had paid between $23,000 and $30,000. The La Follette Company was organized in 1893, and the lands passed to it, the Big Creek Company receiving $10,000 in cash, upwards of $40,000 in notes secured by mortgage, and $200,000 in bonds of the La Follette Company. In the summer of 1896 the La Follette Company was insolvent. It owed about $125,000 of the original vendors' liens on its lands. It had outstanding $1,375,000 of mortgage bonds inferior to these liens. It owed the Electric Corporation, of Boston, its largest creditor, $200,000 borrowed money. Of its bonds, this corporation held $82,000 by purchase and $740,000 as security. The mineral lands of the company were without railroad connection, and therefore practically valueless. It was necessary not only to get time but money to build a road and develop the lands, and no way to do this offered except through the Electric Corporation. Accordingly, H. M. La Follette, the leading stockholder of the La Follette Company, set about to secure a reorganization, first seeing the Electric Corporation. In the fall of 1896 an agreement for the reorganization of the La Follette Company was entered into between its bondholders and the Electric Corporation. La Follette, as a bondholder owning 127 bonds, signed as one party of the first part, and the Electric Corporation signed as the party of the second part. Other bondholders became parties by depositing their bonds with the Trust Company upon the terms of the reorganization agreement. The receipts accepted in exchange expressed this condition. The new corporation, to be known as the Cumberland Coal & Iron Company, was to have an authorized capital stock of $2,500,000, divided into $1,000,000 of preferred and $1,500,000 common, and to issue $500,000 of bonds. The agreement provided that the Electric Corporation should surrender the $740,000 bonds held as collateral, cancel the indebtedness due it, purchase $66,000 of the preferred stock of the new company at 90, exchange the remaining $82,000 of bonds for preferred stock in the new company, and lend the railway company the sum of $150,000 for use in completing the line, transferring to the Cumberland Company a majority of the capital stock of the railway company. In consideration of this, the Cumberland Company was to issue to the Electric Corporation $400,000 of its bonds secured by mortgage. All depositing bondholders were to receive preferred stock in the new company for their holdings. Certain of the bondholders of the La Follette Company declined to deposit their bonds, and it became necessary to foreclose the mortgage on the lands. This was done, the property was purchased by money put up by the Electric Corporation, and was subsequently turned over to the Cumberland Company. In May, 1897, the Cumberland Company was or-

ganized, by-laws adopted, and steps taken to carry out the plan of re-organization. The Electric Corporation furnished the additional money required, turned over the property it had purchased under the foreclosure proceedings, surrendered the bonds and notes it held, and received a certain amount of preferred stock and the $400,000 of bonds. The other bondholders received in lieu of their bonds preferred stock in the new company. The claim of the interveners was that La Follette induced them to enter into the reorganization scheme by fraudulently concealing the fact that the Cumberland Company was to issue, and the Electric Corporation to receive, bonds which would become a first lien upon the property; that he led them to believe there would be no interest in the property of the new company superior to theirs, as holders of its preferred stock. They also contended that the making of the mortgage was beyond the power of the company, and, moreover, was not authorized at any stockholders' meeting lawfully called and held.

1. The right of minority stockholders of a corporation to intervene in a foreclosure suit when the corporation threatens, by collusion or otherwise, to neglect the proper defense of the suit, is established by a line of decisions (Dodge v. Woolsey, 18 How. 331, 341, 15 L. Ed. 401; Davenport v. Dows, 18 Wall. 626, 21 L. Ed. 938, and subsequent cases), but when they intervene they do so, not as individuals, but as stockholders, in the assertion of rights common to the stockholders, which the corporation itself has declined to protect. Dickerman v. Northern Trust Co., 176 U. S. 181, 188, 20 Sup. Ct. 311, 44 L. Ed. 423. In the present case, where the interveners seek no affirmative relief of their own in the rescission of the agreement by which they acquired their preferred stock, but ask only that a foreclosure be denied on the ground that the mortgage, for different reasons, was invalid and void, they must stand upon the rights open to the corporation itself.

2. The principal contention is the charge of fraud. Since this involved disputed questions of fact upon which the master and the court below agreed, there must, under the rule, be a very plain showing of mistake to authorize us to go behind the report as confirmed by the court. Turley v. Turley, 85 Tenn. 251, 1 S. W. 891; Wilson v. Bogle, 95 Tenn. 290, 32 S. W. 386, 49 Am. St. Rep. 929; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Kiewert Co. v. Juneau, 47 U. S. App. 394, 78 Fed. 708, 24 C. C. A. 294; Belknap v. Central Trust Co., 47 U. S. App. 663, 80 Fed. 624, 26 C. C. A. 30. There is no such showing. Not only have the appellants failed to point out any plain mistake of fact or error of law in the report as affirmed, but the examination we have made of the testimony satisfies us that its conclusions are correct on all material points. To defeat the foreclosure, and thus deprive the Electric Corporation of its property in the bonds for which it released its former obligations, turned over to the new company the property it purchased at the foreclosure sale, and supplied the additional money demanded to afford a chance of success, the proof must be convincing that it (as well as the new company) was a party to the alleged fraud which it is claimed induced the interveners to exchange the bonds of the La Follette Company for the preferred

stock of the new company. There is no proof whatever upon this point, only suspicion and assertion. Moreover, it is obvious that, if La Follette did induce the belief that no bonds were to be issued by the new company, it was the failure of the interveners to consult the source of information pointed out in the receipts which permitted its continuance. When they turned over their bonds to the Trust Company, they got in exchange a receipt stating that the bonds were deposited "under and subject to the terms and provisions contained in the instrument known as the 'plan and agreement for reorganization of the La Follette Coal & Iron Company, dated October 15, 1896,' * * * a duplicate of which instrument is in possession of the undersigned. * * * By accepting this receipt the holder assents to the terms and provisions of said instrument, and becomes a party thereto." Ordinary prudence would have dictated that the assenting bondholders should either inspect the plan of reorganization on file, or request a copy from the Trust Company. If they acted on the faith of what they claimed La Follette said, and deemed it of vital importance that his representation be made good, they would not only have examined the agreement, but insisted that a clause be inserted providing that no bonds should be issued. Their subsequent acquiescence in the action of the company affords ground for the suggestion that their present objection is not so much to the issue of the bonds as to the foreclosure of the mortgage securing them.

3. The objection that the mortgage was ultra vires does not appeal to us. The statute of Tennessee (Shannon's Code, § 2054) conferred upon the company the power "to purchase and hold * * * any real estate necessary for the transaction of the corporate business," and also the power "to borrow money and issue notes or bonds upon the faith of the corporate property, and also to execute a mortgage or mortgages as further security for repayment of money thus borrowed." As recited in the mortgage, the bonds were issued "for the purpose of paying or funding an obligation of $400,000 incurred by this company in the purchase of its coal, iron, and timber properties, and also for the purpose of raising funds with which to develop its business and property, or to pay off its liens or indebtedness now or hereafter existing." To issue bonds for the purpose of taking up an outstanding obligation given in the purchase of corporate property is in effect the same as to issue bonds to borrow money with which to pay such outstanding obligation. What may be done indirectly may be done directly. As said by Mr. Justice Shiras, speaking for the Supreme Court, in Jacksonville, etc., Ry. Co. v. Hooper, 160 U. S. 514, 525, 16 Sup. Ct. 379, 383, 40 L. Ed. 515, and using the language of Lord Chancellor Selborne in Attorney General v. Great Eastern Ry., 5 App. Cas. 473, 478:

"This doctrine ought to be reasonably, and not unreasonably, understood and applied, and that whatever may fairly be regarded as incidental to, or consequential upon, those things which the Legislature has authorized, ought not, unless expressly prohibited, to be held by judicial construction to be ultra vires."

4. It was also insisted that the mortgage and bonds were unauthorized because executed and issued at a meeting held June 24, 1897, be-

fore the interveners, who had subscribed for $275,000 of the $1,000,000 of preferred stock, had received their stock and thus obtained the right to vote, and of which meeting due and proper notice was not given the stockholders. The master considered these objections in detail, and found that the required corporate action was taken. It is not necessar, however, to discuss the matter. As the court below suggested, and as we have pointed out, the interveners could make no defense not open to the corporation, and the corporation, having executed the mortgage and issued the bonds, and obtained in exchange money and property which it has since held and treated as its own, is estopped now from saying that what it did do was not done in the right way. The mortgage and bonds were authorized June 24, 1897, executed and issued April 2, 1898, and the foreclosure suit instituted June 5, 1900. Time enough, therefore, elapsed between the authorization and the issue for objections to have been made to the irregularity of the meeting. Since the corporation has enjoyed the fruits of the transaction, and the parties cannot now be replaced in the position they were before the bonds were issued, it is obviously too late to impeach the transaction on the ground of irregularity.

In conclusion, it may be observed that the Cumberland Company does not claim it was in any way deceived by either the Electric Corporation or the Trust Company. It knew what was being done when it got the money and property and gave in exchange the bonds. Those who charge fraud were bondholders of the old corporation. They do not seek a rescission of the contract by which they gave up their bonds and took in exchange the preferred stock. If they had stood out, as some of the holders did, they would have received their share of the proceeds of the property under the foreclosure sale, after paying the underlying vendors' lien. The amount, if any, would have been insignificant. They appreciated this, so they went into the reorganization, gave up their bonds, took the preferred stock, and assumed the resulting risks. There was no guaranty that the reorganized company would prove a success. The existing company had turned out a failure, and the only chance for them was a reorganization with additional capital, offering a mere promise of success. They took the risk, and must abide the result.

The judgment of the court below is affirmed.