**ARN et al. v. DUNNETT et al.**

No. 1544.

Circuit Court of Appeals, Tenth Circuit.

Dec. 14, 1937.

Rehearing Denied Jan. 27, 1938.

F. E. Riddle, of Tulsa, Okl. (O. G. Rollins, of Tulsa, Okl., on the brief), for appellants.

Robert W. Raynolds, of Tulsa, Okl. (W. V. Pryor, of Sapulpa, Okl., on the brief), for appellees.

Before PHILLIPS and BRATTON, Circuit Judges, and SYMES, District Judge.

BRATTON, Circuit Judge.

This is an action instituted by W. G. Arn against Operators Royalty & Producing Company, Ray M. Dunnett and his associates, and others. R. A. Morrison and others subsequently intervened and aligned themselves with plaintiff. Plaintiff and interveners, hereinafter called plaintiffs, are stockholders in Operators Royalty & Producing Company.

Operators Oil Company, organized in 1926 or 1927 and domiciled at Tulsa, Okl., was a producing company engaged in the acquisition and development of land for oil and gas. It had forty-three stockholders. Plaintiffs, residents of Chicago, and Dunnett and his associates, residents of Oklahoma, were owners of stock; and Dunnett and his associates managed its affairs. It was a financial success from its inception and a large well located on one of its leases in Texas which began producing March 14, 1929, gave assurance of increased dividends. Dunnett and his associates promoted and caused Operators Royalty Company (now Operators Royalty & Producing Company) to be incorporated under the laws of Delaware, on April 20, 1929, with an authorized capital stock of 200,000 shares of no par value; and two days later Dunnett and two of his associates were elected as the first board of directors. Dunnett and his associates acquired two separate royalty interests about a week after the corporation was organized. Titles were taken in the name of Dunnett, but he held them for himself and his associates. The purchase price of one was $18,000, and they gave their personal note for it due ninety days after date. The purchase price of the other was $2,500, and it was paid with money borrowed from a bank in Tulsa. The loan from the bank was in the sum of $4,000, for which Dunnett and his associates gave their personal note. Dunnett transferred both of such royalties to the corporation on May 10th; the entire authorized capital stock of 200,000 shares was thereupon issued to him; and a complete record of the transaction was entered upon the books of the corporation. The corporation owned no assets at that time except the royalties thus transferred to it. Dunnett donated 80,000 shares of the stock back to the corporation; 10,000 shares were specially set apart for sale to owners of stock in the oil company; and the remaining 110,000 shares were divided among Dunnett and his associates. Using the name and letterhead of the Royalty Company, a prospectus was prepared on May 2d and sent to the several owners of stock in the oil company residing in Chicago. The organization of the Royalty Company was announced; and the personnel of its officers was stated. It was further stated that the principal business would be to invest in producing royalties; that the entire authorized capital stock had been issued and was paid up and nonassessable; that the officers were setting aside a portion of such stock to be sold in small blocks to their associates and friends, such stock being known as founders' stock; that the first block of 12,000 shares would be offered at $3.50 per share; that additional blocks would be offered at increased prices; that all money derived from such sales would be invested in royalties; that the officers had agreed to waive their rights to dividends for the first year, and to devote their time and efforts to the business of the corporation without pay during the initial year; and that by operating in conjunction with the oil company, it was believed the officers would be able quickly to build up the market price on such stock to $7 or $10 per share. Other statements were made, and the addressees were urged to buy as much stock as their funds would permit. Forty stockholders in the oil company, including plaintiffs, purchased in the aggregate 9,450

shares, and paid a total of $28,175 for it. Virtually all of the checks given in payment were payable to the corporation. They were indorsed and the money deposited in a special account called "James G. Cloud, Special," and the two notes of $18,000 and $4,000, respectively, were paid with checks drawn upon such account. The stock came out of the 10,000 shares which had been specially set apart; the first being issued in June. A second written communication, dated October 25, 1929, was sent to the same group. It stated that the directors had determined to borrow $250,000 and invest it in royalties; that it was planned to liquidate the loan through the sale of shares to present stockholders and their friends; that all shares thus issued would be underwritten by a group of men residing at Tulsa; and that a group in Chicago had already subscribed for 17,250 shares. Other than the 9,450 shares sold to plaintiffs and other stockholders in the oil company residing at Chicago, Dunnett and his associates did not sell or offer for sale any of the stock which they received and retained in exchange for the royalty interests. The officers and directors managed the affairs of the Royalty Company for one year without compensation; and plaintiffs received dividends on their stock aggregating $1.10 per share. The market value of oil subsequently diminished greatly and the company encountered financial difficulty. The company acquired 102,000 shares of stock in Century Petroleum Company, and pledged a substantial part of such stock to secure its note of $12,500 payable to G. W. Dulaney. Dulaney furnished $7,500 and Dunnett and Wheeler $5,000 of the money loaned; and the three entered into an agreement that the stock would be divided among them in a specified ratio if the pledge was foreclosed and the stock purchased at the sale. Default was made in payment, the pledge was foreclosed, and one Murchison became the purchaser.

Plaintiffs attacked the transaction in which the royalties were transferred to the corporation and the stock issued therefor, and the transactions in which the stock was sold to them for fraud; and they challenged the validity of the pledge of stock to Dulaney. They sought cancellation of the stock still retained by Dunnett and his associates, an accounting, rescission of their respective contracts of purchase of stock, judgment for the moneys paid for the stock issued to them, and the appointment of a receiver. The trial court dismissed the bill (1) with prejudice as to the cause of action for cancellation of the stock issued to the promoters and retained by them, and for its restoration to the treasury of the corporation; and (2) without prejudice as to the cause of action growing out of the sale of stock to plaintiffs. Arn v. Operators Royalty & Producing Co., D.C., 13 F.Supp. 769. Plaintiffs appealed.

The bill undertakes to state two separate and independent causes of action. The first is for the cancellation and return to the corporation of all stock issued and delivered to the promoters in exchange for royalty interest which the promoters still retain. That cause of action belongs primarily to the corporation. It is one in which plaintiffs do not have any interest except an equitable right in common with other owners of stock. Stockholders may assert such a cause of action if the corporation fails or refuses to do so, but in that event their rights are derivative and do not rise above those of the corporation. They have no right of redress which is not open to the corporation. Their right to a decree of cancellation and restoration of the stock must be measured by the right of the corporation to such relief. Dickerman v. Northern Trust Company, 176 U. S. 181, 20 S.Ct. 311, 44 L.Ed. 423; Big Creek Gap Coal & Iron Co. v. American Loan & Trust Co., 6 Cir., 127 F. 625; Kessler v. Ensley Land Co., 5 Cir., 148 F. 1019.

Promoters occupy a relation of trust to the corporation which they caused to be organized. They may make a sale of their property to the corporation, but they may be required to disgorge a secret or unlawful profit resulting from such a sale. A profit is not secret or unlawful, however, if all persons having a present interest in the transaction know the facts and give assent to it. And owners of all of the stock of a corporation are the persons having an interest in a transaction so far as the rights of the corporation extend. Further, the duty of full disclosure in a transaction of that kind is confined to persons having an interest in the corporation at the time. It does not extend to those subsequently acquiring shares of stock. Here the promoters of the corporation owned the royalties. They transferred such royalties to the corporation, and the stock was issued in exchange or in pay-

ment for them. They had given their personal notes for the royalties in the first instance and the corporation never became liable for the purchase price, either by assumption of the notes or otherwise. The effect of the transaction was that the corporation acquired and became owner of the property free of obligation, and the promoters owned the stock; and the value of the stock was measured by the value of the royalties. All parties having any interest whatever in the corporation knew the facts and assented to the transaction. There were no other stockholders; there was no secrecy; and no facts were withheld from the promoters or any one having an interest in the corporation. The corporation was not injured through fraud, secrecy, or otherwise; and it could not complain. Plaintiffs acquired their stock after the transaction had been consummated. They cannot assert in a derivative action of this kind that the stock now in the hands of the promoters should be canceled and restored to the corporation. Old Dominion Copper Mining & Smelting Co. v. Lewisohn, 210 U.S. 206, 28 S.Ct. 634, 52 L.Ed. 1025; Ball v. Breed, Elliott & Harrison, 2 Cir., 294 F. 227; Ball v. Chapman, 7 Cir., 1 F.2d 895: South Penn Collieries Co. v. Sproul, 3 Cir., 52 F.2d 557.

It is urged that Davis v. Las Ovas Company, 227 U.S. 80, 33 S.Ct. 197, 57 L.Ed. 426, McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121, and Yeiser v. United States Board & Paper Co., 6 Cir., 107 F. 340, 52 L.R.A. 724, are decisive; but they are distinguishable on considerations of logic and analogy. In the first, certain members of the syndicate which promoted the corporation made a secret profit on the land being acquired for the corporation. They withheld knowledge of that fact from their associates. The innocent associates subscribed for stock and the money paid for it was used to pay the exaggerated price for the property. In the second, the corporation was reduced to hopeless insolvency as result of the transaction. Aside from its obligation to owners of stock, it had outstanding notes and bonds which exceeded the value of its assets by more than $2,000,000. The effect of the promoters' conduct was to paralyze the corporation from the very outset. The action was by a receiver for the benefit of creditors and stockholders. In the third, the fact that the promoters were making a secret profit was withheld from stockholders and directors. One stockholder and one director had knowledge of such profit, and they were induced to silence by illicit considerations. No analogous facts are present here.

■ Repeated stress is laid upon the point that plaintiffs allege a conspiracy on the part of Dunnett and his associates which contemplated the acquisition of the royalties, the formation of the corporation, the transfer of the royalties, the issuance of the entire capital stock to the promoters, and the sale of stock to plaintiffs with false representations and at exorbitant prices, all in violation of the fiduciary relation which existed between the parties as the result of their association together in the oil company; and that everything done was in furtherance of such conspiracy. It is said that the bill presents a common point of litigation; that the decision will affect the whole subject-matter; that it will settle the rights of all parties; and that it is not multifarious. A conspiracy designed to and which does injure a corporation would give rise to an appropriate action by the corporation or a derivative action by stockholders. Likewise, a conspiracy designed to and which does injure individuals through the sale of stock pursuant to false representations and at excessive prices would give rise to an appropriate action. But it is unnecessary to explore the question whether one conspiracy having the dual aspect would warrant a single action for complete redress, because for the reasons previously stated the conspiracy laid in the bill did not give rise to any action on the part of the corporation or to a derivative action by stockholders. Assuming, without deciding, that there was fraud in the sale of the stock to plaintiffs, their remedy is a separate action against the individuals responsible for such fraud, disentangled from a stockholders' derivative action for restoration of stock to the treasury of the corporation and for other equitable relief. Since that part of the bill seeking relief for the sale of the stock to plaintiffs was dismissed without prejudice, their right to institute a new action is not foreclosed.

■■ The challenge to the validity of the pledge of stock as security for the note payable to Dulaney calls for little discussion. The court found that the corporation was in desperate need of money with which to operate; that the loan was made to meet that need; that it was fair; and

that the directors acted for the best interests of the corporation. The findings are supported by substantial evidence and under the frequently repeated rule of this court, they will not be disturbed on appeal. In short, the corporation received and used the full amount of the loan; it later defaulted in payment of the note; and the pledge was foreclosed. No equitable basis to disturb the transaction is perceived.

The decree is affirmed.