**ARN et al. v. BRADSHAW OIL & GAS CO. et al.**

**No. 9163.**

Circuit Court of Appeals, Fifth Circuit.

Dec. 9, 1939.

Rehearing Denied Jan. 29, 1940.

126

Finis E. Riddle, of Tulsa, Okl., for appellants.

M. A. Breckinridge, of Tulsa, Okl., and Wm. Jarrel Smith, of Pampa, Tex., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The complainants, as stockholders in Operators Royalty Production Company, (herein called Operators Company), and as a stockholders' committee, brought a bill against Bradshaw Oil & Gas Company, (herein called Bradshaw Company), and other corporations and individuals, to set aside a judicial sale had Oct. 3, 1933, of the oil and gas properties of the Operators Company, under which the Bradshaw Company now holds title, or alternatively to declare the title held in trust, subject to the liens against the properties outstanding at the sale or since contracted, with an account of oil and gas taken. On a former appeal we held the bill maintainable as a stockholders' suit to assert the rights of the Operators Company, notwithstanding the latter's dissolution. Arn v. Bradshaw Oil & Gas Co., 5 Cir., 93 F.2d 728, 729. It has been tried accordingly, the facts found against complainants and relief denied, this appeal following.

The alleged frauds of the organizers of the Operators Company and its predecessor are not in issue and may be put aside. Relief as to them was finally denied in Arn v. Dunnett et al., 10 Cir., 93 F.2d 634. The present case concerns the sale of all the properties of the Operators Company on Oct. 3, 1933, under mortgage foreclosure by First National Bank & Trust Company, Tulsa, Oklahoma, (called the Bank), the chief contention being that by a collusion between some of the directors of the Operators Company and the Bank the sale was brought about in the depth of the great depression and properties worth over a million and a quarter dollars were bid in by the Bank at less than $150,000, under an agreement to pass them over to the said directors, or for their benefit, on assumption of the Bank's debt of $150,000; that the Bradshaw Company was then organized to take the properties over and hold them, receiving large returns from them which have repaid the Bank, if not all other junior liens against the property. It is claimed in the bill that in addition to the actual collusion, there was a relation of trust between the Operators Company and its directors, because of which they cannot retain any advantage but may be required to surrender it to the Company, equity to that end constructing a trust irrespective of actual fraud. The contention of the respondents is that the directors did all in their power to carry on and refinance the Operators Company in the great depression, that they reduced the Bank's claim from an original $250,000 to $150,000, and after it was foreclosed in October, 1932, procured postponements of the sale for a year, warded off a receivership by creating an executive committee to operate the properties a majority of whom were directors purposely elected because of their connection with the Bank (Mr. Kendall), the largest second mortgage creditors, International Supply Co., (Mr. Bradshaw), and the next largest Merrick & Boyd (Mr. Boyd), while the President Mr. Dunnett and the original directors were to manage the refinancing of the Operators Company; that little income was realized, no purchasers could be found, the Company was in March, 1933, proceeded against as a bankrupt, and a bankruptcy receiver appointed; that the Bank, over the resistance of said receiver represented by the counsel who then and now represent the stockholders, forced a sale which was regularly conducted by the Sheriff, the Bank buying in the property, and thereafter, without any precedent arrangement, resold it to the second lien creditors who organized the Bradshaw Company to receive it; and that the Bradshaw Company has since sold off parts of the property, and has operated the remainder, but has had to drill twenty offset wells at a cost of $25,000 each to protect the property, which are not paid for. The trial judge found there was no misconduct on the part of the directors, no actual collusion or fraud in the sale; and that after it was confirmed, though before the sheriff had executed his deed, the resale was agreed on without any violation of fiduciary duty; that the stockholders with knowledge of what was done took no steps to redeem the property and ignored an

offer, made in 1934 in the pleadings in another but similar suit, to permit a redemption with a discount of the second lien claims, and had speculated on the possible success of the property and could not by this suit filed September, 1936, seek to reap the results.

We shall not review the evidence. It clearly supports the conclusion that all the directors did their best by the Operators Company prior to the sale. Counsel for appellant mainly argues that the respondents Bradshaw and Boyd, being still directors at and after the sale, were bound formally to notify the stockholders that the property had been sacrificed by the sale but could be redeemed from the Bank at a low figure; and that the redemption which was in fact accomplished by these directors inures in equity to the benefit of the Operators Company. We recognize that directors are as respects their corporation and its stockholders quasi trustees, and that they are not allowed to obtain or retain any personal advantage due to a misuse of their position. The application of the principle here fails, because the directors did not misuse their position to obtain the challenged result, and because they have not personally obtained the property of their company.

Kendall, who represented the Bank on the executive committee of Operators Company, resigned when the mortgage was foreclosed and long before the sale. Bradshaw, who was made director and put on the committee as representing International Supply Company, which had the largest second lien of $160,000, resigned his connection with International and surrendered his stock in that company long before the sale. He testifies he resigned also as director in Operators Company and ceased to act as such as early as July, 1933, when the bankruptcy receiver took charge of the Company's offices and books; but there is some evidence to the contrary. Boyd, who actually superintended the wells, testifies he ceased to act as director, as did all the others, when the receiver appeared, though the receiver did not take over the wells, because the State court had them under foreclosure, and that, after July, 1933, he was paid a salary by the Bank for his services in superintending them. The corporation, before and after the sale, was actively represented by its receiver, and additionally in its own name by its counsel employed presumably by the President Dunnett, and these stockholders had their present counsel on the ground and appearing for the receiver. These all applied to the State court for further delay of the sale, which was denied. They opposed confirmation of it both on the ground that the property had sold too cheap and that the collusion above referred to existed. Confirmation was ordered. The Court of Civil Appeals refused to interfere. It is very plain that the sale was not the sale of the directors or any of them but was the sale of the court. No director had brought it about or contributed to it. The stockholders knew all about it through their counsel, just as the corporation knew about it through its counsel, its receiver and its President who was present at the sale. All parties had the same opportunity to purchase the property from the Bank, the successful bidder, and all no doubt knew that the Bank would ask only its money and expenses. The Bank's officer says it would probably have required all cash from this failed Operators Company, or from its stockholders resident in other States, while it was willing to accept (as it did) $15,000 cash from the second lienors who were well known to it, with their guaranty of eventual payment and with the security of the property. The property alone was not safe security. One-half the oil produced had to go to former owners of the leases till $550,000 (the original balance of purchase price) should be paid, while the expense of development and pumping and operating the wells had to be borne out of the other half. When oil was high and production not restricted the property paid well, but in 1933 oil had sunk as low as twenty cents per barrel and proration orders had cut down production from several thousand to 300 barrels daily, so that with the oil payment taking half there was a loss in operation. Oil was going up at the time of the sale, but the uncertainty made the property thus circumstanced undesirable, so that many persons able to buy had declined to consider it before the sale, and the bidding at the sale did not show a value above the Bank's debt. The State court could well conclude that the sale ought to be confirmed. As against the stockholders' objection this is the more apparent, because they could realize nothing unless a price was got sufficient not only to pay the

Bank but also about $275,000 due other liens and creditors. The Bank sought to get the second lienors to bid at the sale, but they would not. Perhaps they, or some of them, thought to make a better deal afterwards, as they did, so far as cash outlay is concerned. But even on the credit which was arranged, when the Bradshaw Company was being organized to assume the matter, and every lien creditor was offered participation pro rata, of the ten lien creditors only five subscribed. This refusal of practical oil concerns, which had from $2,300 to $4,600 each at stake to take the chance, is more persuasive of values at the time than the rosy estimates of engineers, or the favorable results since.

The resale transaction began a few days after the judicial sale and was reduced to writing between the Bank and Bradshaw as trustee naming the lien creditors and their claims eligible to participate, and providing for the organization of a corporation (the Bradshaw Company) and the terms of purchase. When the corporation had been organized and the Bank had paid into court what it had to pay and received the sheriff's deed, it conveyed title to the Bradshaw Company. Since Bradshaw's name was given this company and he was made president we suppose this purchase scheme was originated by him, but he does not appear in the list of its stockholders. Boyd's firm does appear as a stockholder, but the amount of Boyd's interest does not.

Bradshaw therefore has no personal interest in the property. Boyd has acquired some interest, but neither the pleadings nor the evidence are directed to that interest. It is clear that he had nothing to do with the sale, and in entering the repurchase plan to recover if possible his firm's debt against the Operators Company he did not abuse his office as director. Although it now appears that it would probably have been to the interest of the Operators Company and its stockholders to have redeemed the property from the Bank's mortgage and the other liens against it, we find in the facts of this case no sufficient cause to upset the judicial sale of it or to declare a trust against the second lien creditors who took it over, even though two of these creditors had persons connected with them serving as directors of the Operators Company before the judicial sale, along with four or five other directors.

 The principle that fiduciaries will not be permitted to profit personally by selling or buying the property committed to their care irrespective of actual fraud is vindicated in Michoud v. Girod, 4 How. 503, 504, 11 L.Ed. 1076. That a director may buy the corporate property at a fair trustee's sale under his own mortgage is established in Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328. The effect of a clean judicial sale of trust property in ending the trust relationship and enabling the trustee to purchase it afterwards is discussed in Stephen v. Beall, 22 Wall. 329, 22 L.Ed. 786. Our decision of this case is made in the light of these and other cases cited by the parties.

Judgment affirmed.