COLUMBIA RIVER PACKERS' ASS'N v. McGOWAN et al. †

(Circuit Court of Appeals, Ninth Circuit. November 16, 1914.)

No. 2396.

1. STATES ⬅12—BOUNDARY BETWEEN OREGON AND WASHINGTON.

Sand Island, in the Columbia river, near its mouth, is, and has been since the admission of Oregon as a state in 1859, a part of the territory of that state.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 6–11; Dec. Dig. ⬅12.]

2. STATES ⬅12—TERRITORIAL JURISDICTION—LANDS UNDER WATERS—FORMING BOUNDARIES.

Conceding that the states of Oregon and Washington have concurrent jurisdiction over the waters of Columbia river, where it forms the boundary between them, that fact does not give the state of Washington jurisdiction over the land under the waters of the river in a fixed locality which is within the territorial limits of the state of Oregon.

[Ed. Note.—For other cases, see States, Cent. Dig. §§ 6–11; Dec. Dig. ⬅12.]

3. COURTS ⬅266—JURISDICTION—SUIT TO ABATE NUISANCE—SUBJECT-MATTER BEYOND TERRITORIAL JURISDICTION.

Sand Island, in the Columbia river, near its mouth, with its tide lands, are the property of the United States, and wholly within the territorial jurisdiction of the state of Oregon. The government caused a part of the island to be surveyed into fishing sites, to be leased for seining operations, and two of such sites on the south side of the island were leased to complainant. They were used by extending drag nets therefrom and drawing in and landing the same upon the shore. Defendants, under a license from the state of Washington, planted set nets in front of the sites, anchored to the bottom between the shore and channel, and with floats on the surface. Complainant brought suit in the United States District Court for the Western District of Washington, alleging that such structures wholly prevented its operating its drag nets from the shore, that their maintenance constituted a continued trespass and a nuisance, and prayed for an injunction and for their abatement. Both parties then supposed the locality to be within the territorial jurisdiction of Washington, but a later decision of the United States Supreme Court determined that the state boundary was the center of the channel to the north of the island. Thereupon, the court having taken no action beyond the granting of a temporary restraining order, complainant moved to dismiss for want of jurisdiction, which motion was opposed by defendants and denied. *Held,* that the suit was of a local nature, and, both the structures sought to be abated and the property injured being in another state, jurisdiction of the parties did not give the court jurisdiction over the subject-matter.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 806–808; Dec. Dig. ⬅266.]

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Suit in equity by the Columbia River Packers' Association against H. S. McGowan, Erick Lindstrom, and J. P. Coyle. Decree for defendants, and complainant appeals. Reversed.

See, also, 217 Fed. 196.

Suit in equity by the appellant (plaintiff in the court below) against the appellees (defendants in the court below) for an injunction, enjoining and restraining the appellees from placing obstructions in any of the waters of the Columbia river in front of or adjoining two certain fishing sites on Sand island, known as "sites Nos. 2 and 3," alleged to belong to the plaintiff, and from interfering with the free and uninterrupted ingress to and egress from such premises, that all obstructions placed in front of such premises be abated, and that the defendants be required to remove the same. The plaintiff is an Oregon corporation. Each of the defendants is a citizen of the state of Washington.

In an amended complaint filed by the plaintiff on August 11, 1908, it is alleged that the United States is the owner in fee of a tract of land situated in the county of Pacific, in the state of Washington, being an island in the Columbia river, near the mouth thereof, generally known and described as "Sand Island," together with all the tide lands, water rights, privileges, and easements surrounding and adjacent thereto and bordering thereon; that by proclamation of the President of the United States, issued on the 29th day of August, 1863, Sand Island was reserved from sale for military purposes, and the same has ever since been held and reserved by the United States; that on May 1, 1908, the Secretary of War of the United States leased to the plaintiff for a good and valuable consideration the portions of Sand Island designated on the maps of the government survey as "sites Nos. 2 and 3," for the term of three years, together with the tide lands, water rights, fishing rights, and riparian rights adjacent thereto, the portion of the Island so leased being all the frontage, tide lands, riparian rights, water rights, and privileges south, and the high lands north, of the low-water mark of the Columbia river on the south side of the river; that upon the execution and delivery of the lease from the United States the plaintiff immediately entered into the possession of the fishing sites; that Sand Island, including sites Nos. 2 and 3, consists of a sandy beach from the line of low water to the line of high water; that above the high water it is composed entirely of sand; that practically no vegetation grows thereon, and it is not susceptible to cultivation or agricultural uses; that the bed of the Columbia river below the low-water line is quite level, with a hard, sandy bottom, with a gradual slope for a short distance into deep water; that the main channel of the Columbia river washes the shore of the island, where the waters are navigated by all the ocean-going vessels, and all the vessels that carry the commerce of Washington and Oregon navigate such waters; that the fishing sites leased to the plaintiff are of great value for the right of fishery thereon, and the right to operate seines from the shore into the waters thereof, and to haul and land seines in front thereof, for the purpose of catching salmon during the salmon-fishing season of each year on the Columbia river, the fishing sites having been leased by the United States to the plaintiff for the sole purpose of use as a fishery; that on the 30th day of June, 1908, the plaintiff applied to the fish commissioner of the state of Washington, pursuant to the laws of that state, for licenses to operate three seines upon sites Nos. 2 and 3 on Sand Island; that thereupon the fish commissioner issued to the plaintiff three licenses, whereby the plaintiff became entitled to operate three seines in the waters of the Columbia river within the state of Washington for the period of one year thereafter; that on July 2, 1908, while the lease from the United States to the plaintiff was in full force and effect, as well as the licenses issued by the fish commissioner of the state of Washington to the plaintiff, the plaintiff entered upon the leased premises, together with its

three seines and seining outfit, for the purpose of catching salmon; that in order to operate seines in front of sites 2 and 3 it is necessary that the waters and channel of the river be free and unobstructed, for the reason that it is necessary to lay each seine out into the waters of the river for a distance of 200 or 300 fathoms (the length of each seine), and to permit the seine to drift with the tide and current, and then to haul the seine in onto the shore; that the plaintiff was proceeding to operate its seines under its licenses, when the defendants, without the consent of the plaintiff, placed in the channel of the navigable waters of the Columbia river, directly in front of sites 2 and 3, certain obstructions to the navigation of the waters of the river, consisting of large stones, to which were attached wire cables and chains, and large timbers for a float or buoy; that the obstructions were seven in number, and were placed in the waters of the river about 50 to 100 feet from the shore and about 200 or 300 feet apart; that the stones and anchors and weights were large and of great weight, and were so placed that the plaintiff could not operate its seines in the waters of the river, and could not land its seines on the shores of the island; that the obstructions excluded the public generally from operating either gill nets, drift nets, or seines in the waters of the Columbia river, and prevented the free ingress and egress to and from said premises from and to the navigable waters of the river.

It is further alleged in the amended complaint that the plaintiff removed all of the obstructions, and was proceeding to operate its seines in the waters in front of its premises and on the shores thereof, when the defendants, on the 4th day of July, 1908, against the plaintiff's consent placed six other obstructions in front of the premises in practically the same position as those which had been removed by the plaintiff, the last-mentioned obstructions being of the identical nature of those which had been removed by the plaintiff; that these latter obstructions were placed in such position as to absolutely prevent the plaintiff from operating its seines and landing the same on the shores of Sand Island; that the obstructions were in the navigable waters of the Columbia river, and were so placed as to prevent free ingress to and egress from the premises of the plaintiff; that the plaintiff had expended for the purchase of seines and appliances necessary to conduct seining operations on its fishing sites about $15,000, and had employed a large number of men, and engaged a large number of horses, necessitating an expenditure of $200 per day; that in addition the plaintiff was required to pay as rental for the fishing sites the sum of $5,175 per annum; that the salmon in the Columbia river are of great value, and ascend the river only at certain intervals during each year; that at the time of the filing of the bill they were in the waters of the Columbia river in great numbers.

It is further alleged that the obstructions were placed in the waters of the Columbia river without any authority from the officers of the government of the United States, and in violation of the laws of the United States and of the state of Washington; that the obstructions were not for the purpose of trade or commerce, or for any particular use, but were placed in the waters of the river for the purpose of harassing and annoying the plaintiff and preventing it from operating its seines; that they were not placed in the river in good faith, and each was an obstruction to the navigation of the river.

It was alleged that the trespass of the defendants was continuous, and that the defendants would, unless restrained by the court, continue daily to place obstructions to the operation of plaintiff's seines in the waters of the river in front of the plaintiff's premises, and prevent plaintiff from having ingress to and egress from its premises. It was further alleged that, if the defendants were permitted to maintain the obstructions, plaintiff would not be able to use its fishing grounds or employ its seines, and would by reason thereof be irreparably damaged.

The plaintiff prayed for a preliminary injunction, enjoining and restraining the defendants, and each of them, and their agents and employés, from placing in any of the waters of the Columbia river, in front of or adjacent to sites Nos. 2 and 3 on Sand Island, or from maintaining in front of those premises in the waters of the river, any obstruction whatever, and particularly the obstructions maintained at the time of the filing of the bill, and

from any interference with the free and uninterrupted ingress to and egress
from such premises; that all obstructions placed in such waters in front
of the premises of the plaintiff be abated and the defendants be required to
remove the same; that upon their failure to remove the same the plaintiff
be entitled to do so at the cost of the defendants.

On July 7, 1908, a temporary injunction and restraining order was issued
by the court below, pursuant to the prayer of the bill, enjoining and restrain-
ing the defendants, and each of them, and their servants and employés, from
in any manner interfering with the free ingress to and egress from the fish-
ing sites of the plaintiff on Sand Island, and from placing or maintaining
any obstruction, anchor, killock, timber, log, or appliance whatever that
would interfere with the use of a seine floating upon the navigable waters of
the Columbia river in front of or adjacent to sites Nos. 2 and 3 on Sand
Island, in the county of Pacific, in the state of Washington.

Answers and cross-bills were filed by the defendants on August 28, 1908.
The answers put in issue the material allegations of the bill. It was ad-
mitted, however, that Sand Island, together with the fishing sites appurtenant
thereto, were in Pacific county, state of Washington, and within the jurisdic-
tion of the court below. It appeared from the answers that on the 2d day of
July, 1908, the defendants were engaged in the operation of set nets in the
waters of the Columbia river on the south side of Sand Island, the set nets
being operated for the purpose of catching salmon under licenses issued by
the fish commissioner of the state of Washington; that each of the set nets
was situated in front of Sand Island beyond the line of ordinary low water,
and between the point of extreme low tide and the adjacent channel of the
Columbia river; that each set net was located by a stone anchor weighing
about 300 pounds, to which was attached a cable about 5 feet long, which
was clamped to a wire rope about 25 feet long, to which was attached a
cedar buoy about 4 feet long and 8 inches square. The defendants denied
that the set nets constituted any obstruction to the navigable waters of the
river, and denied that they were so placed as to prevent free ingress to and
egress from Sand Island, or any part thereof. The defendants also denied
that the fishing nets were placed or used in the waters of the Columbia river
for the purpose of annoying the plaintiff, or that the same were placed there
for the purpose of preventing the plaintiff from operating its seines.

In the cross-bills the defendants alleged that neither of the set nets was
located upon any part of either site No. 2 or site No. 3; that by reason of
the fact that they had been enjoined by the court and prevented from fish-
ing for salmon they had been damaged to the extent of many thousands of
dollars, the exact amount of which it was impossible to state; that the
plaintiff had threatened to, and would, unless restrained by the court, pre-
vent the defendants from fishing for salmon, or operating their nets for that
purpose, and would exercise an exclusive right of fishing at the place where
the defendants' set nets were situated at the time of the filing of the bill.
The defendants accordingly asked for an injunction, enjoining and restrain-
ing the plaintiff from fishing on the locations of the defendants' set nets in
the Columbia river, and from interfering with the defendants in the main-
tenance and operation of the same. The defendants also asked for a judg-
ment for the damages sustained by them by reason of the issuance of the
temporary restraining order.

The plaintiff demurred to the cross-complaints. The demurrer was over-
ruled. The plaintiff then answered the cross-complaints, denying the ma-
terial allegations thereof, and alleging that the acts of the defendants in
placing set nets in front of its fishing sites on Sand Island were the con-
tinuing trespasses complained of in the bill. The plaintiff further alleged
that it had an exclusive right to drag seines over and across the premises
then occupied by the obstructions placed by the defendants in front of sites
Nos. 2 and 3, which the defendants called "set nets"; that the obstructions
which the defendants called "set nets" were obstructions to the navigation
of the waters of the Columbia river, and absolutely prevented seining opera-
tions on sites Nos. 2 and 3.

On June 4, 1909, the plaintiff filed in the court below a petition, from the
allegations of which it appeared that at the time of the institution of this

suit, and long prior thereto, the officials of the state of Washington had contended that Sand Island was wholly within the territorial limits and jurisdiction of the state of Washington, and had denied that the state of Oregon, or its officers, had or could exercise jurisdiction thereover; that the officials of the state of Washington had contended that the south boundary line of the state of Washington was the middle of the channel of the Columbia river, located immediately south of Sand Island; that the claims of exclusive jurisdiction over Sand Island had been asserted and acted upon and sustained by the officers and courts of the state of Washington for many years prior to the institution of this suit; that pursuant to such claims the citizens of the state of Washington and the officials thereof had at all times taken possession of and exercised exclusive dominion over all the fisheries and fishing rights pertaining to Sand Island, and over all of the waters north of the south channel of the Columbia river; that by reason of such acts and claims the plaintiff had been led to believe that Sand Island was within the territorial boundaries and jurisdiction of the state of Washington, and by reason thereof had instituted this suit in the court below, expecting and intending to prosecute it to final determination; that since the institution of this suit the Supreme Court of the United States, by a decision rendered on the 16th day of November, 1908, in a cause wherein the state of Washington was claimant and the state of Oregon defendant, had held and judicially determined that the boundary line between the state of Washington and the state of Oregon then was, and at all times had been, the north ship channel of the Columbia river, located north of Sand Island; and that Sand Island then was, and at all times had been, within the territorial limits and jurisdiction of the state of Oregon. The plaintiff therefore prayed that the suit be dismissed, without prejudice, for the reason that the court below had no jurisdiction over the subject-matter thereof.

The petition to dismiss was denied. Thereupon the plaintiff obtained leave for and filed a supplemental bill in the court below, setting forth the filing of the original bill, the filing of the answers thereto by the defendants, wherein it was admitted that Sand Island and the premises in controversy were situated in Pacific county, Wash., and further setting forth the various proceedings in this suit as hereinabove set forth. The plaintiff prayed that, if the court should be of opinion that it had jurisdiction of the premises and of this suit, the plaintiff have the judgment and decree prayed for in the original bill, but, should the court be of opinion that it had no jurisdiction of the suit, that it be dismissed without prejudice.

The defendants answered the supplemental bill, denying that Sand Island and the fishing sites in controversy were not wholly within the state of Washington, and denying that the same at that time were within the state of Oregon. The defendants admitted that a suit had been brought in the United States Supreme Court by the state of Washington against the state of Oregon for the purpose of determining the boundary line between those states, and that a decision in that suit had been rendered as set forth in the supplemental bill; but they denied that by that decision it had been established that the boundary line between the states was to the north of Sand Island.

The various issues raised by the pleadings, including the issue of jurisdiction, were heard by the court below. Thereafter an interlocutory decree was entered, adjudging that the plaintiff take nothing by the suit and that the temporary injunction and restraining order theretofore issued against the defendants be dissolved and vacated; that the plaintiff be enjoined and restrained from interfering with the quiet and peaceable enjoyment by the defendants of the right to construct, maintain, and operate the set nets and appliances maintained by them in the waters of the Columbia river below the ordinary low tide thereof. The matter was referred to a special master to ascertain and assess the damages suffered by the defendants by reason of the granting of the restraining order. Upon the report rendered by the master a final decree was entered in favor of the defendants for the sum of $22,083. From the final decree the plaintiff had prosecuted an appeal to this court.

219 F.—24

G. C. Fulton, of Astoria, Or., for appellant.

Dorr & Hadley, of Seattle, Wash., and Welsh & Welsh, of South Bend, Wash., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). There are three questions relating to the jurisdiction of the lower court involved in this case:

First. Is Sand Island, with its south shore or tide lands on that shore, within the territorial limits and jurisdiction of the state of Washington?

If this question is answered in the negative, the next question is:

Second. Is the land under the waters of the Columbia river passing to the south of Sand Island within the concurrent jurisdiction of the courts of the state of Washington with respect to this controversy?

If this question is answered in the negative, the final question is:

Third. Had the lower court equitable jurisdiction by reason of having acquired jurisdiction of the person of the defendants?

If any one of these questions is answered in the affirmative, the jurisdiction of the lower court must be sustained. If they are all answered in the negative, the jurisdiction of the court fails.

[1] 1. The boundary between the states of Oregon and Washington was established by Congress in the act providing for the admission of Oregon into the Union, approved February 14, 1859 (11 Stat. 383, c. 33), and by the act providing for the admission of Washington, approved February 22, 1889 (25 Stat. 676, c. 180). By order of the President of the United States, dated August 29, 1863, Sand Island, at the entrance of the Columbia river, was reserved from sale, and has ever since been retained by the United States as a military reservation. By the act of the Legislature of Oregon passed October 21, 1864, that state granted to the United States all the right and interest of the state of Oregon in and to the land in front of Ft. Stevens and Point Adams, situate in the state of Oregon, and subject to overflow between high and low tide, and also to Sand Island situate at the mouth of the Columbia river in that state. These statutes were the subject of construction by the Supreme Court of the United States with respect to the boundary line between Oregon and Washington in the case of Washington v. Oregon, 211 U. S. 127, 29 Sup. Ct. 47, 53 L. Ed. 118. It was there held that the line followed the middle of the north channel passing to the north of Sand Island, placing that island within the territorial jurisdiction of the state of Oregon.

The defendants in their answer to the supplemental bill admitted that a suit had been brought in the United States Supreme Court by the state of Washington against the state of Oregon for the purpose of determining the boundary line between those states, and that a decision in that suit had been rendered as set forth in the supplemental bill; but they denied that by that decision it had been established that the boundary line between the states was to the north of Sand Island. That contention is renewed in the brief filed by the defendants on this appeal. In support of it, it is urged that the Supreme Court fixed the boundary as "the center of the north channel, changed only as it may be from

time to time through processes of accretion." The defendants assert that the boundary thus fixed was an indefinite roving line, controlled by the fluctuations of the shifting sands of the river; that the testimony in this case showed that the so-called north channel no longer existed to the northward of Sand Island, but had entirely shifted its waters and course to the southward of Sand Island, the territory to the northward of Sand Island having shoaled up by accretion to such an extent that at ordinary low tide a man could walk from Sand Island to the Washington shore. In the decision on the petition for rehearing rendered in the boundary suit on March 8, 1909 (Washington v. Oregon, 214 U. S. 215, 29 Sup. Ct. 632, 53 L. Ed. 969), the Supreme Court considered this very question. It was there said:

"Whatever changes have come in the north channel, and although the volume of water and the depth of that channel have been constantly diminishing, yet, as all resulted from processes of accretion, or, perhaps, also of late years from the jetties constructed by Congress at the mouth of the river, the boundary is still that channel, the precise line of separation being the varying center of that channel."

This is a complete answer to the claim of the defendants that the boundary as fixed by the Supreme Court in its first decision in the boundary suit is not the present boundary between the two states. It follows that since the admission of Oregon into the Union, in 1859, Sand Island has been part of the territory of that state.

[2] 2. The next question to be determined is whether the courts of the state of Washington have been vested with concurrent jurisdiction over this controversy.

By section 1 of the act of Congress of March 2, 1853 (chapter 90, 10 Stat. 172), all that part of the territory of Oregon lying north of the "main channel of the Columbia river" was organized into the territory of Washington, and by section 21 of the same act it is provided that:

"The territory of Oregon and the territory of Washington shall have concurrent jurisdiction over all offenses committed on the Columbia river, where said river forms a common boundary between said territories."

Section 1 of the act of Congress admitting Oregon into the Union (Act Feb. 14, 1859, c. 33, 11 Stat. 383), after describing in detail the boundaries of the state, provided:

"Including jurisdiction in civil and criminal cases upon the Columbia river and Snake river, concurrently with states and territories of which those rivers form a boundary in common with said state."

In section 2 it is said:

"The * * * state of Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering on the said state of Oregon, so far as the same shall form a common boundary to said state, and any other state or states now or hereafter to be formed or bounded by the same."

The act of Congress admitting Washington into the Union, and the Constitution of that state, are silent on the subject of concurrent jurisdiction. There is therefore a question whether the state of Washington has, by appropriate concurrent action, acquired concurrent jurisdiction of the waters of the Columbia river; but we pass that question to

consider whether in any view the courts of Washington have jurisdiction over the locality in controversy.

In Nielsen v. Oregon, 212 U. S. 315, 29 Sup. Ct. 383, 53 L. Ed. 528, one Chris Nielsen was a resident and inhabitant of the state of Washington, and a citizen of the United States. He had a license from the fish commissioner of Washington to operate a purse net on the Columbia river, and was found on the waters of the Washington side of that river fishing with a purse net. He was arrested for violating a law of the state of Oregon prohibiting the taking of fish in that manner. By the law of the state of Washington in force at that time fishing with a purse net was lawful by those having a license so to do from the fish commissioner of that state. Nielsen was tried and convicted in the courts of Oregon for violation of the law of that state. The single question was whether the law of Oregon prohibiting the taking of fish with a purse net extended over the entire waters of the Columbia river, or whether it was confined to the Oregon side. The Supreme Court of the state held that, where adjoining states had concurrent jurisdiction on the waters forming their boundary, the laws of each state regulating the common right to take fish from such waters were valid and binding when not in conflict, and if there was a conflict the law of that state which was the most restrictive in its character must prevail, and to that extent the state which first assumed jurisdiction maintained it to the exclusion of the other. The court accordingly held that the law of Oregon extended over the waters of the Columbia river, and the conviction of Nielsen in the Oregon court was sustained. State v. Nielsen, 51 Or. 588, 95 Pac. 720, 131 Am. St. Rep. 765, 16 Ann. Cas. 1113. The case was taken to the Supreme Court of the United States, where the judgment of the Supreme Court of the state of Oregon was reversed; the Supreme Court of the United States holding that for an act done in the territorial limits of the state of Washington, under authority of a license from that state, a person could not be prosecuted and punished in the state of Oregon. Nielsen v. Oregon, 212 U. S. 315, 321, 29 Sup. Ct. 383, 53 L. Ed. 528.

In the present case the action is in the nature of a bill to restrain a trespass and abate a nuisance. When the action was commenced in 1908 in the United States court in Washington, it was believed by the appellant that the locality of the alleged trespass and nuisance on the south side of Sand Island was within the territorial limits of the state of Washington, and the action was accordingly brought in that jurisdiction. In the appellees' answer to the appellant's bill of complaint it was admitted that Sand Island, in the Columbia river, was in the state of Washington. Upon the final decision of the Supreme Court of the United States on May 24, 1909, holding that Sand Island was within the territorial jurisdiction of the state of Oregon, the appellant moved to dismiss its bill for want of jurisdiction, on the ground that the suit was a local one and concerned real estate and property situate in the state of Oregon. The court denied the motion to dismiss the bill, and, referring to the decision of the Supreme Court of the United States in the case of Nielsen v. Oregon, supra, held that, although the Constitution of the state of Washington defining the state's boundaries made no mention of concurrent jurisdiction on the Columbia river, the state

had not lost its jurisdiction by reason of its failure to assert it by positive enactment. The court, however, placed its decision upon the act of Congress, approved March 2, 1905, dividing the state of Washington into two judicial districts. The act provided that certain counties lying east of the Cascade Mountains, with the waters thereof, should be detached from the judicial district of Washington, "and the residue of said state, * * * with the waters thereof, shall hereafter be the Western district of Washington." 33 Stat. 824, c. 1305.

We are of opinion that, assuming that the state of Washington has concurrent jurisdiction on the Columbia river, with respect to matters occurring on the river, it does not follow that the state has jurisdiction over a locality under the river within the territorial jurisdiction of the state of Oregon, and we do not understand that Nielsen v. Oregon so holds. The court in that case was dealing with the question of jurisdiction on the waters of the Columbia river, and with respect to a purse net or seine operated upon the surface of the water, and in that case the Supreme Court held that Oregon did not have concurrent jurisdiction to impose its laws upon the Washington side of the river. In the present case we are dealing with a complaint relating to the operation of set nets placed upon the ground under the water in a fixed locality definitely known to be within the territorial limits of the state of Oregon. To hold that Sand Island and its shore, within the exclusive territorial jurisdiction of the state of Oregon, are also within the concurrent jurisdiction of the state of Washington, because the waters of the Columbia river separate and pass on both sides of the island, would be to extend concurrent jurisdiction to land for which we find no authority in any of the adjudged cases. We are of opinion that the courts of Washington acquired no concurrent jurisdiction over the locality in question under any construction of the statutes relating to concurrent jurisdiction on the Columbia river.

[3] 3. The final question is: Did the court have equitable jurisdiction of the case by reason of having acquired jurisdiction of the person of the defendants?

To determine this question it is necessary to clearly understand the subject-matter of the controversy. Sand Island, with its shore between high and low water mark, is the property of the United States—the island by reservation of the President of the United States, August 29, 1863, and the shore by grant of the state of Oregon, October 21, 1864, to the United States, of all the tide lands to Sand Island. Both land and shore of this island are within the territorial jurisdiction of the state of Oregon. By act of Congress approved July 28, 1892 (27 Stat. 321, c. 316 [Comp. St. 1913, § 6944]), the Secretary of War was authorized in his discretion to lease, for a period of not exceeding five years, such property of the United States under his control as might not at the time be required for public use. Under this authority, the Secretary of War had the United States engineers make a survey of the island, including the shore, and divide the southwest and south side of the island into fishing sites to be leased for seining operations. The southwest and south side of the island was accordingly divided into five seining sites, and offered for lease to the highest bidder. Sites 2 and 3, with which alone we are concerned in this case, had a front-

age on the south channel of the Columbia river of 3,500 feet each. The first contract of lease was for three years, from 1905 to 1908, when the appellee, McGowan, was interested as a sublessee in the operation of the frontage included in site No. 2, and he carried on fishing operations from the shore of that site without molestation or hindrance. For the term of three years from 1908 to 1911 the appellant and the appellees were rival bidders for sites 2 and 3. The appellant, being the highest bidder, was awarded the lease for this period at a rental of $5,-175 per annum, payable in advance on the 1st day of May of each year. The appellees did not, however, abandon the locality, but procured from the fish commissioner of the state of Washington set net licenses, and with this authority they proceeded to occupy the waters and ground below high water in front of the appellant's sites with set nets, practically destroying the value of these shore sites to the appellant for fishing purposes. But manifestly the fish commissioner of the state of Washington had no authority to issue set net licenses to be used at a fixed and definite locality within the territorial jurisdiction of the state of Oregon. It is true the appellant had also procured from the fish commissioner of the state of Washington licenses to fish with drag nets in the waters of the Columbia river. Now, while it may be conceded that these licenses gave to the appellant no greater right to a locality than did the set net licenses of the appellees, the fact remains that the appellant had the right in common with the public to engage in the business of drawing seines in the waters of the Columbia river in front of sites 2 and 3, and the exclusive right of drawing and landing the same upon the shore of the island within those sites; and it is this exclusive right of drawing and landing on shore that we are considering, and not the general right of fishing in the Columbia river, for which the appellant claims no exclusive right. It was when the appellant was proceeding to operate drag nets from the shore within its sites that it met the obstacle and obstruction of set nets placed in front of its sites by the appellees. It was then impossible for the appellant to operate its drag nets from the shore, or draw or land the same on the shore, with the appellees' set nets in front cutting off access to the river. Thereupon the appellant, believing Sand Island to be within the territorial jurisdiction of the state of Washington, brought this suit against the appellees in the United States Circuit Court for that jurisdiction to restrain the trespass that was being committed by the appellees upon the appellant's right of access to and egress from its premises, and to abate the nuisances that were being erected in front of its premises. When the Supreme Court of the United States in its final decision of May 24, 1909, in Washington v. Oregon, 214 U. S. 205, 29 Sup. Ct. 631, 53 L. Ed. 969, held that Sand Island was within the jurisdiction of Oregon, the appellant moved the court to dismiss the action, on the ground that it was a local action and the court was without jurisdiction to hear the case. The motion was resisted by the appellees, and was denied by the court, on the ground that the court had jurisdiction of the locality involved in this case, under the statutes giving it jurisdiction over the waters in the Northern district of Washington.

In Gilbert v. Moline Water Power & Mfg. Co., 19 Iowa, 320, this precise question was before the Supreme Court of the state of Iowa.

That was a suit brought in the courts of Iowa to abate a dam alleged to be a nuisance, on the Illinois side of the Mississippi river. It appeared that the plaintiff was a citizen of the state of Iowa. It also appeared that the property alleged to have been injured by the maintenance of the nuisance was within the jurisdiction of the Iowa court. The plaintiff based his claim to jurisdiction upon the language of the acts admitting Illinois and Iowa into the Union, and the provisions of the Constitution and statutes of each state defining their respective boundaries. The act admitting Illinois gave to that state concurrent jurisdiction on the Mississippi river with any state or states to be formed west thereof, so far as the same should form a common boundary. The act admitting Iowa contained the same provision as to concurrence of jurisdiction. By the Constitution of Iowa the eastern boundary of the state was the middle of the main channel of the Mississippi river In ruling against jurisdiction the Supreme Court of Iowa said:

"Now, while it is, of course, not claimed that the laws of this state would have any inherent authority beyond the jurisdiction of the state, or that our laws can bind or affect property out of or beyond our territorial limits, it is insisted that this property, or that this alleged nuisance, is so situated that either state may direct the manner of its use, and order its abatement or removal, if found to be of the character charged. That the courts of Illinois might do this, there is, of course, no doubt. But the claim is that our courts have the same concurrent right, on the complaint of one of our citizens, whose property, situated within our jurisdiction, is injured by the alleged unlawful obstruction. We do not believe, however, that the acts and constitutional provisions referred to include cases like that now before us. There is an immense commerce on this great common highway. Water crafts, rafts, and boats of almost every kind and description, are each day floating upon its waters. Thousands of persons are engaged in this commerce. Contracts are made, and obligations assumed, for which these boats and crafts may, under certain proceedings, be made liable. Injuries are inflicted upon persons and property, by persons while *on the river*, for which they should be held answerable, criminally as well as civilly. If jurisdiction in all such cases were made to depend on the inquiry whether the boat or vessel was on one side or the other of the main channel, whether the injury was inflicted or crime committed east or west or north or south of such line, it can be readily seen that it would be frequently almost impossible to determine such jurisdiction, and that a mistake in this respect would prove fatal to the action or proceeding; and hence the reason of making the jurisdiction concurrent in all such cases. Such property and persons are, as a rule, transitory, moving—here to-day, and gone to-morrow. Here is a common highway open to the citizens of all states and all nations. It is declared common territory, and, as to matters arising thereon, or persons found thereon, the sovereignties on either side have common or concurrent jurisdiction. Not so, however, as to an obstruction, where the property therein, and the use thereof, is wholly on one side of the channel. It is as though an unhealthy, dangerous, or illegal manufactory should be erected and continued on the Illinois shore, to the injury and annoyance of citizens on the Iowa side; and though such erection should extend below low-water mark, there would be no jurisdiction to declare its abatement in our courts. Such injuries are not *on* the river, within the purview of the acts referred to and relied upon by counsel. And this conclusion is the more warrantable, when we consider that in this case the main dam extends from the shore to the island (Rock Island), that this island, containing hundreds of acres of land, is indisputably a part of the territory of our sister state, and that, to reach this obstruction or nuisance, our courts and the officers thereof must go beyond this island, and decree and procure the removal of a work attached to the main shore, and placed there, too, we are bound to suppose, with the consent of the state to which the corporation owes its life."

The leading case in support of the rule that jurisdiction on the navigable rivers does not extend from one state into another for the abatement or removal of nuisances is Mississippi & M. Railroad Co. v. Ware, 2 Black (67 U. S.) 485, 17 L. Ed. 311. That was a suit brought in the District Court for the District of Iowa, for the abatement of the Rock Island bridge over the Mississippi river from Rock Island, in the state of Illinois, to Davenport, in the state of Iowa. It was alleged that the bridge was a public nuisance. After laying down the rule that a public nuisance may be abated on a bill in equity brought by a private party who has suffered special damage, the Supreme Court of the United States said:

"The bridge is 1,570 feet long, and the number of piers is six. Three of them are on the Iowa side of the river. The draw pier is the fourth. It is 386 feet long at its bottom, and 45 feet wide. The draw space on the Iowa side is 111 feet and on the Illinois side 116 feet wide in the clear. The distance from center to center of the small piers is 257 feet. The long pier stands at an angle with the thread of the current of about 24 degrees, and the small piers are nearly on a line with the thread of the current. The Illinois draw passage is directly over the deepest channel of the river, and directly over the usual track of steamboats before the bridge was built. The Mississippi is about 1,410 feet wide at the bridge, and the middle of the river is about 80 feet westwardly of the long pier. The Illinois draw passage (116 feet), and width of the long pier (45 feet), and the 80 feet between it and the eastern line of Iowa, cover a space of 240 feet of water way, and which embraces the main channel, where steamboats have at all times navigated. It was at the long pier, and in the Illinois draw east of that pier, that the complainant's boats sustained the injuries on which he founded his right to sue the Iowa corporation, and to proceed against the bridge in rem as a public nuisance. An indictment could only have been prosecuted against the owner for keeping up the nuisance in Illinois in the courts of that state, because the nuisance was a trespass and crime against the laws of Illinois, and the injuries to complainant's boats, giving him the privilege to sue and abate the obstruction were as local as the public right to indict. He asks nothing from the person of the defendant, but seeks to remove a local object, because he has sustained special damage from that object. The District Court had no power over the local object inflicting the injury; nor any jurisdiction to inquire of the facts, whether damage had been sustained, or how much. These facts are beyond the court's jurisdiction and powers of inquiry, and outside of the case."

If the Supreme Court of the United States could not sustain the jurisdiction of the Iowa court on the waters of the Mississippi river to the abatement of a nuisance thereon in the state of Illinois, in a case in which a part of the nuisance at least was admitted to extend into the jurisdiction of the court, much less in this case can the jurisdiction of the state of Washington on the waters of the Columbia be extended into the state of Oregon and sustained to abate a nuisance which is entirely within the jurisdictional limits of the state of Oregon.

The appellees, in further support of the claim of jurisdiction, invoke the equitable maxim that equity acts in personam and not in rem. They contend that the jurisdiction of the court below was dependent neither upon the location of Sand Island nor upon the concurrent jurisdiction of the state of Washington and the state of Oregon on the waters of the Columbia river. They assert that, having secured jurisdiction of the parties to the controversy, the court below, as a court of equity, had full jurisdiction to try and dispose of all of

the issues involved; that the injunction issued against the plaintiff operated in personam, and, the plaintiff being within the jurisdiction of the court, it was bound to obey the injunction, although it required the doing of an act beyond the jurisdiction of the court.

Neither the maxim, nor the argument which the defendants adduce from it, is applicable to this case. Pomeroy, in his work on Equity Jurisprudence (3d Ed., § 1318), speaking of actions in personam, says:

"The power to act in personam, through their remedies, is still held by all courts of equity. * * * Of this nature must always be the remedies when the subject-matter, either real or personal property, is situated beyond the territorial jurisdiction of the court, in another state or country. The jurisdiction to grant such remedies is well settled. Where the subject-matter is situated within another state or country, but the parties are within the jurisdiction of the court, any suit may be maintained and remedy granted which *directly* affect and operate upon the person of the defendant, and not upon the subject-matter, although the subject-matter is referred to in the decree, and the defendant is ordered to do or to refrain from certain acts toward it, and it is thus ultimately but *indirectly* affected by the relief granted. As examples of this rule, suits for specific performance of contracts, for the enforcement of express or implied trusts, for the final accounting and settlement of a partnership, and the like, may be brought in any state where the jurisdiction of the defendant's person is obtained, although the land or other subject-matter is situated in another state, or even in a foreign country. On the other hand, where the suit is strictly local, the subject-matter is specific property, and the relief when granted is such that it *must* act directly upon the subject-matter, and not upon the person of the defendant, the jurisdiction must be exercised in the state where the subject-matter is situated; * * * for example, a suit to abate a nuisance"—citing Mississippi & Missouri Ry. Co. v. Ward, supra.

In the Salton Sea Cases, 172 Fed. 792, 812, 97 C. C. A. 214, the objection was made that the Circuit Court of the United States for the Southern District of California had no jurisdiction to decree an injunction in effect abating a nuisance injuring property within the jurisdiction of the court. It was claimed that there was a rule supporting the objection that a court of equity could never compel a defendant to do anything which was not capable of being physically done within the territorial jurisdiction of the court. This court upheld the jurisdiction of the lower court, but placed the jurisdiction expressly upon the ground that the injured property was within the jurisdiction of the court—citing Northern Indiana Ry. Co. v. Michigan Central Ry. Co., 15 How. (56 U. S.) 233, 14 L. Ed. 674; Mississippi & Missouri Ry. Co. v. Ward, supra; Gilbert v. Moline Water Power, etc., Co., supra.

There is nothing in the facts of this case to render these well-settled rules of equity inapplicable, or, when applied, to render their application inequitable. The plaintiff accepting the general belief that Sand Island was within the territorial jurisdiction of the state of Washington, filed his suit in good faith in that district. Answers and cross-complaints were filed by the defendants, and answers to the cross-complaints were filed by the plaintiff after demurrer overruled. That was as far as the suit had progressed, when the Supreme Court decided that Sand Island was within the jurisdiction of the state of Oregon. No hearing had been had and no testimony taken on the

merits of the controversy. After the rendition of the decision of the Supreme Court of the United States in the boundary suit, the plaintiff, in equal good faith, petitioned the court below to dismiss the bill for lack of jurisdiction. At that time the restraining order, issued against the defendants upon the filing of the bill, had been in effect 11 months. The defendants having resisted the motion to dismiss, and having insisted that the suit be heard and determined by the court below, cannot now be heard to complain that the plaintiff insists that the court is without equitable jurisdiction to hear and determine the controversy.

The decree of the court below is reversed, with directions to dismiss the bill. The costs will be divided; the costs prior to the appellant's motion to dismiss the bill to be paid by the appellant, and the remaining costs to be paid by the appellees.