## EQUITABLE TRUST CO. OF NEW YORK v. WASHINGTON–IDAHO WATER, LIGHT & POWER CO. et al.

## GUARANTY BANK & TRUST CO. v. SAME.

(District Court, E. D. Washington, S. D. July 14, 1924.)

Nos. 928, 936.

1. **Courts 268—Court without jurisdiction to foreclose mortgage on property outside jurisdiction.**

   Where no part of mortgaged property was within the jurisdiction of District Court of Massachusetts, that court was without any semblance of jurisdiction to foreclose corporate mortgage, and its order appointing receivers and impounding the property was absolutely void.

2. **Courts 264(2)—Where original foreclosure bill is void, ancillary bill has no legal effect.**

   In proceedings to foreclose mortgage in Massachusetts District Court, where bill to foreclose mortgage is void, ancillary bill, filed in District Court for Eastern District of Washington, has no legal effect.

3. **Mortgages 401(2)—In case of conflict, procedural provision gives way.**

   Provision in corporate mortgage that failure to pay interest, on continuance of such failure for 60 days, is a default, and provision that in case of default foreclosure action may be instituted without waiting for expiration of 60 days, cannot be harmonized, and latter, being an incidental procedural provision, must give way.

4. **Equity 273—Inserting wholly different case by way of amendment not permitted.**

   While liberality of amendment should be shown where bill is defective in proper parties, in its prayer for relief, or omission of some fact or circumstance connected with substance of case, but not forming substance itself, yet inserting a wholly different case by way of amendment will not be permitted.

5. **Stipulations 1—Stipulation as to regularity of proceedings held valid.**

   A stipulation in a mortgage foreclosure action waiving objections as to regularity of proceedings, signed by defendant's counsel, whose authority was unquestioned, and who fully understood matter, *held* valid, as against claim of fraud.

6. **Stipulations 1—When stipulation set aside stated.**

   A stipulation, deliberately considered and carefully prepared, signed by parties through competent counsel with complete knowledge of facts, and presented to court as basis for judicial action, which is in fact taken, should not be disregarded at a later stage of proceedings at behest of one party, except on a very plain and satisfactory showing of overreaching or fraud, or that stipulation was entered into without authority, or was result of excusable inadvertence, or that great and oppressive hardship would result by holding it valid.

7. **Attorney and client 86—Counsel authorized to stipulate as to procedural matters.**

   Counsel, by virtue of his employment, has authority to stipulate all matters pertaining to procedure.

8. **Corporations 206(5)—Stockholders held not entitled to intervene and prevent mortgage foreclosure.**

   Stockholders *held* not entitled to intervene and prevent foreclosure of a mortgage by corporation, which still retained benefits thereof, on theory that corporation, because of fraud and collusion, refused to defend action.

9. **Corporations 207½—Stockholders can interpose only such defenses as are available to corporation.**

   When stockholders intervene to defend suit on behalf of corporation, they stand in corporation's shoes, and can assert only such rights and

interpose only such defenses as are open and available to corporation itself.

**10. Corporations ⬤══388(1)—Corporation may be estopped to deny that it complied with formalities prerequisite to validity of its action.**

A corporation acting within general scope of its powers may be estopped to deny that it has complied with legal formalities which are a prerequisite to validity of action taken by it.

**11. Corporations ⬤══388(2)—Corporation estopped to assert invalidity of notes while retaining benefits.**

A corporation is estopped to assert the invalidity of notes and mortgages while retaining benefits received thereunder.

**12. Bills and notes ⬤══497(4)—Interveners have burden of negativing bona fides of holders.**

In mortgage foreclosure action, burden of proof is on stockholders as interveners, claiming notes and mortgage to be ultra vires, to negative bona fides of original holders of notes.

**13. Corporations ⬤══466, 482(5)—Failure to secure written request of preferred stockholders held not to render title of holders of mortgage notes defective, or shift burden of proof.**

Failure to secure written request of preferred stockholders or make appraisement of property as provided in amended articles of incorporation, in absence of showing that holders of notes secured by mortgage knew of such failure, *held* not to render their title defective, or shift burden of proof.

**14. Corporations ⬤══482(5)—Evidence held not to negative presumption of bona fides of notes.**

Evidence *held* not to negative prima facie presumption of bona fides of holders of corporate mortgage notes.

**15. Bills and notes ⬤══497(2)—Party challenging notes has burden of proof.**

The burden is on party challenging notes to negative prima facie presumption of bona fides of holders.

**16. Corporations ⬤══465—Notes issued for labor and material held valid.**

Corporate mortgage notes issued for labor and material furnished in installation of plant under nominal operation of subsidiary company *held* valid.

**17. Evidence ⬤══98—Responsibility for inconclusive character of evidence borne by party having burden of proof.**

Responsibility for inconclusive character of evidence must be borne by party on whom rests burden of proof.

**18. Evidence ⬤══60—No presumption in favor of perfidy.**

No presumption will be indulged in support of perfidy.

**19. Mortgages ⬤══559(3)—In trustees' mortgage foreclosure action, no deficiency judgment permissible.**

In a mortgage foreclosure action, where trustees under mortgages are not owners of debts secured within federal equity rule 10, and there is no provision in mortgage giving them right to recover a deficiency judgment, such a judgment is not permissible.

**20. Corporations ⬤══482½—Where property consists of realty and personalty, and any segregation would be detrimental, property sold without redemption.**

Where property covered by corporate mortgages consists of both real estate and personalty, so intermingled that each class is essential to the other in furnishing public service, and any segregation thereof would be detrimental to interests of all parties, property will be sold without redemption.

In Equity. Separate suits, consolidated for trial, by the Equitable Trust Company of New York and by the Guaranty Bank & Trust Company against Washington-Idaho Water, Light & Power Company and others. Decision rendered.

⬤══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Grosscup & Morrow, of Seattle, Wash., Murray, Aldrich & Roberts, of New York City, and John A. Laing, of Portland, Or., for complainant Equitable Trust Co. of New York.

John A. Laing, of Portland, Or., and Frederick Bausman, R. P. Oldham, and Walter L. Nossaman, all of Seattle, Wash., for complainant Guaranty Bank & Trust Co.

Winter & Maguire, of Portland, Or., and Guy E. Kelly, of Tacoma, Wash., for defendant Washington-Idaho Water, Light & Power Co.

Wright, Froude, Allen & Hilen, of Seattle, Wash., for interveners Bonney, McQuail, and Curts.

WEBSTER, District Judge.   Washington-Idaho Water, Light & Power Company (hereinafter for convenience called Washington-Idaho. Company) is a corporation organized under the laws of the commonwealth of Massachusetts and engaged in the states of Washington and Idaho in the business of generating, selling, and distributing electric current for light and power purposes, and in the sale and distribution of water for irrigation and domestic uses.   On December 11, 1916, it executed to the complainant the Equitable Trust Company of New York (hereinafter called the Equitable Company), a corporation organized under the laws of New York, as trustee for the bondholders, a first mortgage on certain of its properties to secure the payment of a contemplated issue of $5,000,000 of 6 per cent. gold bonds, $754,000 of which were duly certified by the Equitable Company and properly disposed of in the open market by the Washington-Idaho Company to raise money for its corporate purposes.   The principal of these bonds was payable on May 1, 1941, and bore interest at the rate of 6 per cent. per annum, payable semiannually on May 1st and November 1st of each year.   On November 1, 1921, the Washington-Idaho Company defaulted in the payment of the semiannual installment of interest due on that date, amounting to $22,620.

On December 10, 1921, the Equitable Company filed in the District Court of the United States for the District of Massachusetts its original bill in equity, alleging this default in the payment of interest and praying a foreclosure of the mortgage; that the property be sold under the direction of that court and that the proceeds be applied in accordance with the provisions of the mortgage; that a receiver be appointed to take possession of the property and to manage and conduct the business of the Washington-Idaho Company, with all the usual powers and duties of receivers in such cases; and that an injunction be issued restraining the defendant company and all other persons from interfering with the property thus taken into the judicial custody of that court.   No part of the property covered by the mortgage was at that time, or ever had been, in the state of Massachusetts, or within the territorial jurisdiction of the District Court of the United States for the District of Massachusetts; all the property and assets of the Washington-Idaho Company at all times being in the states of Washington and Idaho.   Notwithstanding this, the District Court of Massachusetts, upon the filing of the complaint, made and entered an order appointing Julian Codman, of the city of Hamilton, Mass., receiver

of the defendant corporation, and he thereupon duly qualified as such. The order also enjoined all interference with the property thus placed in the custody of the receiver.

On December 12, 1921, the Equitable Company filed in this court an ancillary bill in equity, alleging the filing of the original bill in the District Court of Massachusetts, the appointment and qualification of Codman as receiver of that court, that there was located in the state of Washington property belonging to the defendant Washington-Idaho Company, and that the fixed property covered by the mortgage was located partly in the Eastern district of Washington and partly in the District of Idaho, but all thereof being within the Ninth judicial circuit of the United States. This bill further alleged that "a receivership in this court, ancillary in character, will protect the interests of all creditors and stockholders of the said defendant, Washington-Idaho Water, Light & Power Company." The ancillary bill in this court did not repeat the allegations of default set forth in the complaint filed in the District Court of Massachusetts, but merely referred to a copy of that complaint, which was attached to the bill as an exhibit. The relief prayed in this court was that an order be made taking into its judicial custody the property of the defendant Washington-Idaho Company in the state of Washington, and that the same be administered under the general orders and direction of the United States District Court for the District of Massachusetts, subject to such special orders as this court might deem prudent and proper in the premises. In short, the original bill in this court was purely ancillary in character, and expressly recognized the District Court of Massachusetts as the tribunal of primary jurisdiction and of principal decree.

Upon the filing of this proceeding, Judge Rudkin made and entered an order reciting the proceedings in the District Court of Massachusetts, and that the judge of that court had taken jurisdiction of the cause and had appointed Julian Codman temporary receiver therein, and reciting further "that said ancillary bill filed in this court is also in the nature of an original bill for the foreclosure of a mortgage covering property in Whitman and Asotin counties, in this district, and Nez Perce county, in the district of Idaho," and that the appointment of a temporary receiver to prevent the dissipation of the assets of the defendant company and subserve the public interests was necessary and proper. The order then proceeded to appoint Codman and Morrow coreceivers of the defendant corporation and its property in the states of Washington and Idaho. This order also enjoined the company and all other persons from interfering with the property so taken into the custody of the court. Codman and Morrow thereupon executed the bond provided in the order of appointment and qualified as joint receivers.

On January 4, 1922, the Equitable Company filed in this court a pleading entitled "Amended Bill in Equity, Ancillary and in the Nature of an Original Bill." This amended bill brought in additional parties, and, after setting forth certain formal matters, again alleged the proceedings in the District Court of Massachusetts, pleaded the mortgage and made profert thereof, alleged the execution by the Washington-

Idaho Company of certain deeds of further assurance covering after-acquired property, alleged the existence of other after-acquired property, not included in the deeds of further assurance, but which fell within the clause in the mortgage relating to property subsequently acquired by the company, set forth property in Lewis and Cowlitz counties, in the Western district of Washington, consisting of an electric generating and distributing plant owned and operated by the Washington-Idaho Company through its receivers, and alleged the execution of a mortgage by the Washington-Idaho Company to Guaranty Bank & Trust Company, making that company a party defendant. It then alleged, for the first time in this court, the default of the defendant Washington-Idaho Company in the payment of the interest due November 1, 1921, and pursuant to the power conferred by the mortgage elected to declare the entire principal due together with the interest thereon.

As additional acts of default not theretofore asserted, either in this court or in the District Court of Massachusetts, it alleged that the Washington-Idaho Company had failed to maintain its resident statutory agents in the states of Idaho and Washington, entitling it to exist and do business in those states as a foreign corporation, and by reason thereof had incurred penalties under the laws of both states, that the company had wrongfully diverted income derived from the mortgaged property, that it had failed to make proper and necessary betterments to the plant, and to maintain it in a proper state of efficiency, that it had incurred a large floating debt and was insolvent, and, finally, that the company had failed to pay taxes on the mortgaged property due the states of Washington and Idaho, and setting out the amounts thereof. Then followed a prayer for a writ of subpœna directed to each of the defendants, that an accounting be had, that the lien of Guaranty Bank & Trust Company be ascertained and fixed by decree, that the lien of Portland Trust Company of Oregon, a new defendant brought in by the amendment, also be ascertained and fixed, that receivers be appointed to preserve and operate the property under the direction of this court, and for all general relief.

Thus, for the first time, notwithstanding the recital in the order made by Judge Rudkin to which I have adverted, the proceeding in this court became an original one, seeking to invoke the jurisdiction of this court as the court of principal decree for the foreclosure of the mortgage upon the property described therein, every particle of which was, and always had been, in the states of Washington and Idaho. That the recitation in the original order made by Judge Rudkin to the effect that the bill first filed in this court was in the nature of an original bill was inadvertently made is amply demonstrated by the memorandum filed by him on January 27, 1922, in ruling upon the complainant's motion to further amend its bill of complaint. In that memorandum he said:

"There can be no question that the original bill filed here was purely ancillary in its character. It is so styled, and while it shows the requisite diversity of citizenship, it shows that the jurisdictional amount is involved by inference only, if at all, and merely prays that the court take into its jurisdictional custody the property of the defendant in this state and administer

the same under the general orders and directions of the United States District Court for the District of Massachusetts. * * * As already stated, the jurisdiction of this court was invoked as ancillary to the jurisdiction of the District Court of Massachusetts, and jurisdiction in a *purely ancillary proceeding* to appoint a receiver for property without the territorial jurisdiction of the court is doubtful, to say the least."

Obviously an erroneous and inadvertent recitation in an interlocutory order cannot, by its own force, convert a purely ancillary proceeding into an original one. Moreover, counsel for the Equitable Company, by the first amended complaint, recognized the fact that the original bill filed in this court was ancillary merely, for by this amendment they took pains to convert the ancillary into what they call for the first time an "amended bill in equity, ancillary and in the nature of an original bill," and proceeded to include appropriate allegations to make it conform to its new title. Later, by leave of court, other amendments were made, not necessary to be detailed, since they did not alter the general character of the action as hereinbefore stated. The principal effect of these amendments was to allege that the defaults in the payment of taxes and the failure to maintain the property in a proper state of repair occurred and existed more than 60 days prior to the commencement of the action in the District Court of Massachusetts. Subsequent to the filing of these amendments, and on March 20, 1922, the District Court of Massachusetts, on motion of the complainant, dismissed the bill filed in that court. Additional facts will be found in the course of this memorandum in connection with the questions to which they relate.

[1] Counsel for the Washington-Idaho Company insist that the Massachusetts court was wholly without jurisdiction in the premises, no part of the mortgaged property being within the territorial jurisdiction of that court, and, in addition, that the action was prematurely brought, the default in the payment of interest due November 1, 1921, not having continued for 60 days prior to the institution of that suit; that, the original action being void for want of jurisdiction, the purely ancillary proceeding in this court based thereon must likewise fail; and that the amendments permitted by the court, especially in respect of the failure to pay interest, were improper, since the wrongful impounding of all the company's property and assets by the receivership in the District Court of Massachusetts rendered it impossible for the Washington-Idaho Company to make good its failure to pay the interest within the time stipulated in the mortgage. On all of these propositions I am constrained to accept the views of counsel for the Washington-Idaho Company. No part of the mortgaged property being within the jurisdiction of the District Court of Massachusetts, it seems clear to me that that court was without any semblance of jurisdiction to foreclose the mortgage, and the order of that court appointing receivers and impounding the property and assets of the defendant company was absolutely void. Primos Chemical Co. v. Fulton Steel Corporation (D. C.) 254 Fed. 454. Farmers' Loan & Trust Co. v. Northern Pacific Railroad Co. (C. C.) 72 Fed. 26. Columbia River Packers' Association v. McGowan, 219 Fed. 365, 134 C. C. A. 461; sections 54, 55, 56, and 57, Judicial Code.

The case of Muller v. Dows, 94 U. S. 444, 24 L. Ed. 207, relied upon by counsel for the Equitable Company, does not militate against this conclusion. In that case a portion of the property sought to be foreclosed was within the jurisdiction of the United States Circuit Court for the District of Iowa, the court making the decree, and over that property it had unquestioned jurisdiction. The property involved was a line of railroad, and the Supreme Court held that the Iowa court had jurisdiction to order the sale of the entire property. Counsel for the Equitable Company contend that the District Court of Massachusetts had jurisdiction of the person of the Washington-Idaho Company, and, having such jurisdiction, had the power, acting in personam, to compel a conveyance of the title to the property to the Equitable Company. It seems to me a sufficient answer to this contention to say that no such relief was sought at the hands of that court. The bill plainly was the usual one seeking a foreclosure of the mortgage, a sale of the property, and the appointment of a receiver to preserve the assets pending the final determination of the cause, together with an injunction preventing any interference with the judicial custody of the property by that court. The order of the Massachusetts court, made on application of counsel for the Equitable Company, appointing receivers to take into the custody of that court all the assets and property of the Washington-Idaho Company and enjoining all interference with such custody, shows beyond controversy that both court and counsel regarded the proceeding as a foreclosure action in the ordinary and usual course. It was not considered as being in any sense a proceeding in the nature of a bill invoking specific performance. The court in that case was not requested to order a conveyance to the complainant of the title to the mortgaged property, leaving the Equitable Company the right to foreclose in the court having jurisdiction of the res. On the contrary, a foreclosure and sale of the property in the ordinary and usual form was precisely what the action contemplated—just that and nothing else. As said by Mr. Justice Strong in Muller v. Dows, supra:

"It is here undoubtedly a recognized doctrine that a court of equity, sitting in a state and having jurisdiction of the person, may decree a conveyance by him of land in another state, and may enforce the decree by process against the defendant. *True, it cannot send its process into that other state, nor can it deliver possession of land in another jurisdiction, but it can command and enforce a transfer of the title.*"

[2] The original proceeding in Massachusetts being void from the beginning, it necessarily follows that the ancillary bill in this court predicated thereon was likewise of no legal effect. It would be an absurdity to say that a void proceeding in Massachusetts will vitalize and give legal effect to a proceeding in the state of Washington. Primos Chemical Company v. Fulton Steel Corporation, supra, and cases therein cited.

[3] I come now to the contention that the action instituted in the District Court of Massachusets was prematurely brought, even though that court had been clothed with jurisdiction to entertain it. Let it be remembered that the only act of default relied upon in that action was the failure on the part of the Washington-Idaho Company to pay the

November 1, 1921, installment of interest on the bonds, and that the suit was commenced on December 10, 1921, or 40 days thereafter. A solution of this question calls for a consideration of the provision of the mortgage in respect of defaults and the procedure provided for the enforcement of the security. The pertinent provisions are found in section 2 of article 3 of the mortgage. They read as follows:

"Upon default by the company as to the payment of interest on the bonds, * * * and the continuance of such default for 60 days, or upon default as to the payment of the principal, etc., * * * in every such case the security hereof shall become enforceable and the trustee may enforce such security by either of the methods following: * * * The trustee, without waiting for the expiration of the period of 60 days, and without any notice to the company, may forthwith * * * institute such proceedings either at law or in equity as it may deem proper for the foreclosure of this mortgage."

It is at once apparent that these provisions are in irreconcilable conflict with each other. The first portion of the section defines an act of default, namely, the failure to pay interest on the bonds, coupled with the continuance of such failure for 60 days. The latter portion defines certain methods of procedure open to the trustee in the case of default, one of them being, without waiting for the expiration of the period of 60 days, to institute foreclosure proceedings. In effect, the section provides that, upon the failure on the part of the company to pay the interest on the bonds, provided such failure is continued for 60 days, the trustee may institute foreclosure proceedings, even though such failure has not continued for 60 days. Palpably one part or the other of this language must be rejected. The provisions are in collision and cannot be harmonized.

Which shall give way? The portion of the section defining what acts shall constitute defaults on the part of the company is of the highest importance. These provisions fix substantial rights of great value. The portion relating to the procedure to be adopted in case of default is subordinate, incidental, and comparatively of small consequence, since the courts always will provide a suitable procedure and remedy in case of default, in the absence of any provision in the mortgage with respect to that matter. In fact, until an act of default has become complete, questions of proper methods of procedure to foreclose do not arise, and such questions are at all times subordinate to the fundamental and prior right to foreclose in some manner. It seems plain to me that, in case of such a conflict as this, the substantial and important thing must be preserved, and that the subordinate and incidental procedural provisions must give way; that until there has been a complete and perfected act of default no proceeding can be adopted invoking foreclosure. Beal's Cardinal Rules of Legal Interpretation (3d Ed.) 171. I conclude that, until the default in the payment of interest had continued for 60 days, there was no right of foreclosure on that account by any method whatsoever.

[4] With respect to the allowance by Judge Rudkin of the applications to file amended bills of complaint converting the purely ancillary proceeding into an original bill of foreclosure in this court, I feel constrained to say, with the utmost deference to that distinguished jurist, that I should have made a contrary ruling. It appears to me that the

amendments allowed completely changed the nature of the action—
that they constituted the substance of the action itself and amounted to
a new bill. Nor can it be said that the permitting of these amendments
did not injuriously affect the substantial rights of the Washington-
Idaho Company, for they reasserted as the principal act of default the
failure to pay the November 1, 1921, installment of interest, which
had not continued in default for 60 days, so as to become complete
at the time the company was deprived of all its assets and property by
the void proceedings in the District Court of Massachusetts, and had
thus been rendered wholly unable to make good the default, during the
60-day period of grace provided by the mortgage. The rule of law upon
which Judge Rudkin relied in allowing these amendments is found in
United States v. Whitted, 245 Fed. 629, 634, 158 C. C. A. 57, 62, and
is in this language:

"The rule is too well settled to require the citation of authority that un-
der the privilege of amending a party is not permitted to make a new bill.
While much liberality of amendment should be shown, where the bill is
found defective in proper parties, in its prayer for relief, or in the omission or
mistake of some fact or circumstance connected with the substance of the
case, but not forming the substance itself, yet to insert a wholly different
case, as is attempted by this proposed amendment, is not properly an amend-
ment, and should not be considered within the rules on that subject."

I subscribe to the foregoing as a correct statement of the controlling
legal principle, but in applying it to the situation presented here I
should have refused the amendments and relegated the complainant to
an action of foreclosure in the court of proper jurisdiction, free from
the entanglements growing out of the premature commencement of the
void proceeding in the Massachusetts court.

[5] My conclusions with respect to the foregoing questions bring
me face to face with the stipulation entered into on or about February
25, 1922, between the Equitable Company, the Guaranty Bank & Trust
Company, and the Washington-Idaho Company, through their respec-
tive counsel, and the interlocutory decree entered pursuant thereto by
Judge Wolverton. This stipulation, so far as material here, in substance
recites that whereas, the Equitable Company had brought suit to fore-
close its mortgage, and the Guaranty Bank & Trust Company had
brought suit to foreclose a mortgage held by it and executed by the
Washington-Idaho Company, and that various disputes had arisen be-
tween the parties relative thereto, and then proceeds to provide that the
validity of the mortgage of the Guaranty Bank & Trust Company is
conceded, that the Equitable Company's mortgage and the Guaranty
Bank & Trust Company's mortgage shall be treated on a parity in any
sale or reorganization of the properties of the Washington-Idaho Com-
pany under certain conditions, that for all purposes the property cov-
ered by both mortgages shall be considered and dealt with as an entire-
ty, that the parties will join in requesting the court to order the property
sold as an entirety, that the two foreclosure proceedings then pending
should be consolidated and prosecuted to final decree, that receivers
should be appointed for the joint property without discrimination in
favor of either trustee, that if the Equitable Company or its bondhold-
ers should obtain control of the stock of the Washington-Idaho Com-

300 F.—39

pany the same should be used for the purpose of carrying out the stipulation, and that the temporary receivers should immediately file their final account and have their compensation fixed by the court.

Prior to the making of this stipulation the Washington-Idaho Company, through its counsel, Mr. Maguire, had interposed motions for the dismissal of the receivership upon the ground that the court was without jurisdiction, and these motions were still pending when the stipulation was entered into. On February 25, 1922, Judge Wolverton passed an interlocutory decree, which, while not reciting the stipulation, was based thereon. This decree recited that the motions to dismiss the receivers had been withdrawn by the Washington-Idaho Company, and after other appropriate recitals proceeded to make effective substantially the arrangement agreed upon in the stipulation. Counsel for the Washington-Idaho Company, however, contend that the written stipulation was fraudulent and void, and in support of this contention rely upon a collateral transaction between the Equitable Company and Waller, the president of the Washington-Idaho Company, the effect of which was as follows:

The Equitable Company agreed to pay Waller, the owner of 2,150 of the entire 2,250 shares of the common stock of the Washington-Idaho Company, $10,000 for an assignment of his equity in the stock, together with an irrevocable proxy and power of attorney to vote the same. Waller was to resign, and to obtain the resignation of two other directors of the company, and the Equitable Company was to release and discharge Waller from any and all demands and liabilities of every kind. Mr. Maguire acted as attorney for Waller in negotiating this transaction, and was thoroughly conversant with every detail of it; the $10,000 purchase price for the stock having been paid to him and Seitz, as attorneys for Waller. As I have already said, Mr. Maguire, acting as counsel for the Washington-Idaho Company and in the name of that company, signed the written stipulation, and with full knowledge of all the facts withdrew his motions to dismiss the receivers for want of jurisdiction. His authority to act for the company in those matters has not been challenged by the Washington-Idaho Company, or by any of the holders of the common stock, and he is appearing now in this case as counsel for that company in waging this attack upon the stipulation. There has never been any intimation in the case, from first to last, either that Mr. Maguire was without authority in the premises or that he was acting in collusion with the Equitable Company or any one else in perpetrating a fraud upon the Washington-Idaho Company or upon any of its stockholders.

The argument is advanced that there is no evidence showing that the agreement made with Waller was ever ratified by the company, but this instance is entirely without merit. All the facts and circumstances point to ratification, or at least to acquiescence. Moreover, Mr. Maguire, now appearing as counsel for the Washington-Idaho Company, in attacking the stipulation which he himself signed, has not produced a syllable of evidence tending to show either lack of ratification of or failure to acquiesce in the Waller transaction, though obviously such evidence, if it existed, was under his control. On the contrary, he ar-

gues that he was obliged to sign the stipulation because the control of the company had, by the sale of the Waller stock, passed to the Equitable Company. If the transaction had not been ratified or sanctioned by the company, why was he compelled to act in the name of the company in signing the stipulation, which he now asserts violated its important property rights? On the other hand, if he was compelled to sign the stipulation, why is not the company bound by it? If, as he contends in his brief, the sole purpose of the Equitable Company in buying the Waller stock was to secure the stipulation, how can he with any sort of consistency accept as attorney for Waller the $10,000 purchase price of the stock, and now as counsel for the Washington-Idaho Company assert that the Equitable Company acquired nothing by the transaction? The attack upon the stipulation, under all the facts disclosed by the record, does not impress me. I am at a loss to understand how a party can, with any show of reason, assert that it has been defrauded in a transaction when its attorney, acting within his authority, had absolute and complete knowledge as to every detail and circumstance entering into the matter. Mr. Maguire is an able and experienced lawyer. His authority in the premises has not been challenged. He acted advisedly and with full knowledge of the facts, and he ought not now to be heard as counsel for the same client to attack his own acts and doings in the name of that client.

[6] A solemn stipulation, deliberately considered and carefully prepared, signed by the parties thereto through competent and seasoned counsel with complete knowledge of the facts, and presented to a court of justice as a basis for important and far-reaching judicial action, which is in fact taken, ought not to be disregarded at a later stage of the proceedings at the behest of one of the parties to it, except upon a very plain and satisfactory showing that some one has been overreached or defrauded, or that the agreement was entered into without authority, or was the result of excusable inadvertence, or that great and oppressive hardship would result by holding it valid. None of these elements is present in this case. I am convinced that the stipulation is valid and binding, so far, at least, as the Washington-Idaho Company and its common stockholders are concerned, and that no sufficient reason has been advanced upon which this court would be justified in setting it aside and annulling all the subsequent proceedings predicated upon it. Moreover, the premature bringing of the action, the withdrawing of the motions to dismiss the receivers, the permitting of the amendments converting the ancillary into an original bill in this court, the consolidation of the two foreclosure proceedings, the waiving of technical objections and allowing the action to proceed to final decree, were all matters of procedure merely and involved no question of jurisdiction either of the person or of the subject-matter.

[7] Neither did they affect the cause of action itself. In the absence of the written stipulation, Mr. Maguire, as counsel for the Washington-Idaho Company, had authority by virtue of his employment to stipulate all matters relating to procedure. 2 Ruling Case Law, p. 986, § 63; 25 Ruling Case Law, p. 1097, § 4. It is beside the question to say that the stipulation dealt with matters which were not procedural in

character. Even if it did, that fact would not render the stipulation invalid with respect to matters of procedure purely. The waiving of objections as to the regularity of the proceedings in the case, which did not affect the cause of action itself, clearly was within the power of Mr. Maguire to control. This, I believe, disposes of the controversy so far as the mortgage of the Equitable Trust Company is concerned; all the necessary proof entitling it to the relief prayed having been submitted at the trial.

[8] I pass now to a consideration of the mortgage of the Guaranty Bank & Trust Company (hereinafter called the Guaranty Company) and the questions arising thereon. On April 1, 1921, the Washington-Idaho Company executed to the Guaranty Company a mortgage or deed of trust covering certain property which had been expressly excepted from the mortgage to the Equitable Company. The purpose of this mortgage was to secure the payment of a contemplated issue of notes in the principal sum of $300,000, all of which were duly certified by the trustee and delivered to the president of the Washington-Idaho Company. Of this note issue $6,000 par value thereof are in the possession of the receivers, $10,000 thereof are in the hands of the corporation commissioner of the state of Oregon or the State Bank of Portland, and $284,000 are outstanding in the hands of the present owners and were presented to the court at the trial. On January 2, 1922, the Guaranty Company brought suit in this court to foreclose its mortgage, alleging as an act of default the appointment of the receivers in the Equitable Company case.

On May 25, 1922, Bonney, McQuail and Curts, as a committee representing certain of the preferred stockholders of the Washington-Idaho Company, pursuant to permisssion of the court, intervened in the cause, and filed an answer setting up that the Washington-Idaho Company had wrongfully entered into the stipulation of February 25, 1922, and was in collusion with the Equitable Company and the Guaranty Company, and in consequence thereof had made no appearance or defense to the action and did not intend to do so. This answer alleges, further, that not to exceed $20,000 of the secured notes had been issued by the Washington-Idaho Company, and that the entire issue, together with the mortgage given in security thereof, were ultra vires and void; that it is provided by the articles of incorporation of the Washington-Idaho Company that no mortgage or other lien should be created to secure an amount of indebtedness which, with the total par value of the preferred shares outstanding and the entire funded indebtedness of the company, should exceed the physical valuation of the property, to be determined by appraisers appointed by the company at the request in writing of 50 per cent. in interest of the holders of the preferred shares outstanding; and that the notes and mortgage in question had been issued in violation thereof—no request for appraisement having been made and the amount of the indebtedness created being in excess of the limit fixed by the articles.

[9] Many interesting questions have been presented, both in oral argument and in the briefs, touching the issue thus presented, but in view of my conclusions with reference to certain aspects of this matter many of them need not be discussed. The interveners are seeking no

affirmative relief of their own, but ask only that foreclosure of the mortgage be denied on the ground that it is ultra vires and void, and they justify their advent into the case by showing that the company, because of fraud and collusion, had refused to appear and defend the action. When stockholders, either common or preferred, thus intervene in a cause, they stand in the shoes of the corporation, and can assert only such rights and interpose only such defenses as are open and available to the corporation itself. In the case of Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423, the question was whether a minority of the stockholders of a corporation have a right to intervene in the foreclosure of a mortgage upon the corporate property for the purpose of showing that the property was sold to the corporation by connivance of the mortgagees at a gross overvaluation, and to compel the bonds held by them to be subjected to a set-off of the indebtedness to the corporation for unpaid stock. Mr. Justice Brown, speaking for the court, said:

"It should be borne in mind, in connection with the several defenses set up by the intervenors, that they do not appear here in the capacity of creditors, but as stockholders; that their rights are the rights of the corporation, and must be asserted and enforced through the corporation, and upon the theory that the latter has or threatens, by collusion or otherwise, to neglect the proper defense of the foreclosure suit."

Many cases are cited in support of the proposition thus announced. In Big Creek Gap Coal & Iron Co. v. American Loan & Trust Co., 127 Fed. 625, 62 C. C. A. 351, Lurton, Severens, and Richards sitting, this doctrine was approved and applied in a case almost identical with the case in hand. In that case preferred stockholders intervened for the purpose of contesting the validity of a mortgage then in the course of foreclosure upon the ground that its execution was ultra vires, and had not been authorized at any stockholders' meeting lawfully called and held. In the course of the opinion the court said:

"The right of minority stockholders of a corporation to intervene in a foreclosure suit when the corporation threatens, by collusion or otherwise, to neglect the proper defense of the suit, is established by a line of decisions [citing cases]; but, when they intervene, they do so, not as individuals, but as stockholders, in the assertion of rights common to the stockholders, which the corporation itself has declined to protect. Dickerman v. Northern Trust Co., 176 U. S. 181, 188, 20 Sup. Ct. 311, 44 L. Ed. 423. In the present case, where the intervenors seek no affirmative relief of their own in the rescission of the agreement by which they acquired their preferred stock, but ask only that a foreclosure be denied on the ground that the mortgage, for different reasons, was invalid and void, they must stand upon the rights open to the corporation itself."

In applying this doctrine to the facts of that case (page 635 [62 C. C. A. 361]) this language is employed:

"As the court below suggested, and as we have pointed out, the intervenors could make no defense not open to the corporation, and the corporation, having executed the mortgage and issued the bonds, and obtained in exchange money and property which it has since held and treated as its own, is estopped now from saying that what it did do was not done in the right way. * * * Since the corporation has enjoyed the fruits of the transaction, and the parties cannot now be replaced in the position they were before the bonds were issued, it is obviously too late to impeach the transaction on the ground of irregularity."

The interveners here are seeking relief against an alleged fraud and wrong practiced upon them as individual shareholders, as distinguished from the corporation itself. Whatever rights the interveners have or may have had in the premises, it seems plain that such rights cannot find recognition or expression in this character of proceeding. Their individual wrongs or injuries cannot be asserted here, for the purpose of influencing the result of the foreclosure proceeding. The soundness of this position becomes patent, when one pauses to consider what would be the result or effect if the interveners should be permitted to successfully interpose the defense upon which they rely.

Counsel insist that the article of incorporation in question was intended for the benefit and protection of the preferred stockholders of the company, but obviously this court, in declaring the mortgage and notes void, could not award them in their individual capacities any interest in, or title to, the property covered by the mortgage. If their contention should be sustained, the result inevitably would be to cancel the notes and mortgage and leave the property involved an asset of the company, free from the lien of that incumbrance. In other words, the net consequence would be to declare invalid notes which the company had sold and received the benefits of, permit it to keep and enjoy the fruits of its own wrongful conduct, and at the same time to retain the property involved free of the mortgage lien. Obviously, no court of conscience could be induced to put the seal of its approval upon so barbarous a doctrine. The mortgage to the Guaranty Company recites:

"Whereas, the stockholders and directors of the company have adopted all necessary votes and resolutions, and all proceedings required by law have been taken for the proper authorization of the notes herein referred to, and of this indenture: Now, therefore," etc.

The notes contained this provision:

"This note shall not become obligatory for any purpose until the certificate indorsed hereon is signed by the trustee or its successor or successors in the trust, and such certificate shall be conclusive proof against the company that this note is one of the notes issued under said trust deed and constitutes a valid, legal, and binding obligation of the company."

[10, 11] We must not lose sight of the distinction between the doing by the company of an act beyond the scope of the powers granted to it by law, and the irregularity in the exercise of its granted powers, nor must we overlook the rule that, when a corporation is acting within the general scope of the powers conferred upon it by law, it may be estopped to deny that it has complied with the legal formalities which are prerequisite to the validity of the action taken by it. That the Washington-Idaho Company is estopped to assert the invalidity of the notes and mortgage, while retaining the benefits of the executed transaction, seems too plain to require extensive discussion. The following cases will be sufficient to sustain the correctness of that conclusion: Louisville, etc., Railway Co. v. Louisville Trust Co., 174 U. S. 552, 19 Sup. Ct. 817, 43 L. Ed. 1081; St. Louis, Vandalia, etc., Co. v. Terre Haute & Indianapolis Railroad Co., 145 U. S. 393, 12 Sup. Ct. 953, 36 L. Ed. 748; Shafer v. Spruks, 225 Fed. 480, 140

C. C. A. 504; Sioux City Terminal, etc., Co. v. Trust Company of North America, 82 Fed. 124, 27 C. C. A. 73; Buhl Independent School District v. Neighbors of Woodcraft (C. C. A. 9) 289 Fed. 196; Big Creek Gap Coal & Iron Co. v. American Loan & Trust Co., supra; Eastman v. Parkinson, 133 Wis. 375, 113 N. W. 649, 13 L. R. A. (N. S.) 921. In Louisville, etc., Railway Co. v. Louisville Trust Co., supra, it is said:

> "One who takes from a railroad or business corporation, in good faith, and without actual notice of any inherent defect, a negotiable obligation issued by order of the board of directors, signed by the president and secretary in the name and under the seal of the corporation, and disclosing upon its face no want of authority, has the right to assume its validity. *if the corporation could, by any action of its officers or stockholders, or of both, have authorized the execution and issue of the obligation.* * * * The records of the railroad corporation and of its board of directors, which would naturally show whether such a petition had or had not been filed, were private records, which a purchaser of the bonds was not obliged to inspect, as he would have been if the fact had been required by law to be entered upon a public record."

[12, 13] The burden of proof was on the interveners to negative the bona fides of the original holders of the notes, and no evidence was introduced at the trial having any such effect. The mere failure to have the written request of the preferred stockholders or to make an appraisement of the property as provided in the amended articles, in the absence of a showing that the original holders had knowledge of such failure, especially in view of the provisions of the notes themselves, did not render the title of such holders defective or shift the burden of proof. Hotchkiss v. National Bank, 21 Wall. (88 U. S.) 354, 22 L. Ed. 645; Murray v. Lardner, 2 Wall. (69 U. S.) 110, 17 L. Ed. 857; First National Bank v. Moore, 148 Fed. 953, 78 C. C. A. 581; Santa Marina Co. v. Canadian Bank, 254 Fed. 391, 165 C. C. A. 611; Young v. Lowry, 192 Fed. 825, 113 C. C. A. 149; Washington & Canonsburg Ry. Co. v. Murray, 211 Fed. 440, 128 C. C. A. 112; 3 Ruling Case Law, p. 1037, §§ 240, 242, 243 and 244; 8 Corpus Juris, 983, 984.

I conclude that the attack upon the entire note issue and mortgage given in security of it cannot be upheld. It will be noted that in coming to this conclusion I have put out of mind the stipulation of February 25, 1922, in respect of its effect upon the preferred stockholders. If the Washington-Idaho Company was estopped as a matter of law from interposing the defense relied upon by the interveners, clearly no injustice was done the preferred stockholders by the stipulation, which merely had the effect of declaring that to be the case.

In addition to the general attack upon the entire issue of the Guaranty Company 8 per cent. notes, certain blocks of these securities are separately assailed upon the ground that they were not properly put off by the Washington-Idaho Company, and that the holders thereof are not such for value in due course These notes, for convenience of reference, have been designated "the Bank of Hillsboro notes," "the Fox & Co. notes," "the Mays notes," and "the Ong Wong notes." These transactions will be discussed in the order stated.

[14, 15] *The Bank of Hillsboro Notes.*—Gardner, the cashier, testified that the Hillsboro Bank, in December, 1921, exchanged $60,000 par value of the Equitable Company 6 per cent. bonds for an equal amount par value of the Guaranty Company 8 per cent. notes, the exchange being made with Gillespie. After careful search I find that the record is silent as to the title of Gillespie to the 8 per cent. notes transferred by him. The burden is on the party challenging the notes to negative the prima facie presumption of bona fides. Young v. Lowry, supra; First National Bank v. Moore, supra. The evidence submitted to discharge this burden falls short of the mark. Counsel attacking these notes say:

"Any benefit from the transaction must have gone to Mr. Gillespie, who made the deal, and the company is now in the situation where, instead of having a single liability upon the 6 per cent. bonds, it has an additional liability in a like amount upon the gold notes."

The ready answer to this is that, if Gillespie was the owner of the 8 per cent. notes, and there seems to be no evidence to the contrary, the situation of the company was not at all altered to its disadvantage by the exchange of securities. Counsel's argument assumes that Gillespie's ownership of the 8 per cent. notes was the ownership of the Washington-Idaho Company, and there is nothing in the record to warrant such assumption. Courts must act upon evidence. They cannot indulge in speculation and guess work in determining the rights of litigants. After all, the question is, not what the company actually received in the transaction, but what the holders in good faith paid for the securities in the ordinary course of commercial dealing.

[16] *The Fox & Co. Notes.*—These notes were issued in payment for labor and material furnished in the installation of the power plant at Centralia, Wash., and at the request of the Washington-Idaho Company. That plant was under the nominal operation of the Sherman County Light & Power Company, but that corporation is a subsidiary of the Washington-Idaho Company; the latter owning all the common stock of the former. In these circumstances, there is little room for doubt as to the validity of the notes. Lumbermen's Trust Co. v. Title Insurance Co., 248 Fed. 212, 160 C. C. A. 290; In re New York Car Wheel Works (D. C.) 141 Fed. 430.

*The Mays Notes.*—It appears from the evidence that in May, 1921, Mays purchased from Waller, the then president of the Washington-Idaho Company, a note of that company payable to Waller in the sum of $25,000, which was duly indorsed by Waller and delivered to Mays. As collateral security for the payment of the note, Waller delivered to Mays $100,000 of the Guaranty Company 8 per cent. notes; collateral in this amount having been demanded by Mays. The testimony of Mays is not satisfactory. At one time he testified that it was his understanding that the collateral notes belonged to Waller. At another time he stated he understood that they belonged to the company. His entire deposition indicates that his recollection of the transaction was hazy and obscure, and that in entering into it he was being advised by a friend. That Waller had possession of the 8 per cent. notes at the time of the sale to Mays is not controverted. Mays further testified

that upon the maturity of the $25,000 principal note he took in lieu of it Waller's personal note in like amount and surrendered to Waller the company's note. He retained, however, the $100,000 of 8 per cent. notes as collateral to the Waller note. It seems quite improbable that he would have retained the 8 per cent. notes as security for the Waller note, if it was his understanding or belief that the collateral notes belonged to the company. This improbability increases when it is recalled that Mays is a lawyer.

[17, 18] Subsequent transactions, however, shed light upon the matter. Mays sold the Waller note to Agnew, who later brought suit to foreclose the collateral notes, alleging that Waller was the owner. Waller answered, admitting ownership. Dundas intervened in the action, and Mr. Maguire represented him as counsel. In this intervention it was affirmatively alleged that Waller was the owner of the notes. The Washington-Idaho Company made no claim to the notes in that proceeding, though from the evidence it seems highly probable that it knew of its pendency. I do not refer to this as constituting an estoppel, but merely as a circumstance shedding light on the question. Waller, however, was peculiarly in a position to clarify the situation, and, although he was present at the trial, he was not called as a witness. Neither was Agnew called to testify. While I should like to react to a more fixed conviction concerning these notes, I do not feel that in this state of the record the presumption of good faith has been overcome. The responsibility for the inconclusive character of the evidence must be borne by the party upon whom rests the burden of establishing bad faith. No presumptions will be indulged in support of perfidy.

*The Ong Wong Notes.*—These notes amount to $1,200, but the record concerning them is so vague that I am unable to ascertain just what are the facts in relation to them. The only reference to them in the briefs is found in the brief of counsel attacking them in this language:

"The deposition of Miss Prichard, the bookkeeper of the company, shows that gold notes were issued to Wong On in the sum of $1,200 in payment of a bill owing him by the Sherman County Light & Power Company."

From this I assume that these notes come within the same category as the Fox & Co. notes, which have already been considered. At any rate, there is nothing in the record which would warrant me in declaring them invalid.

[19] I shall now take up some matters relating to the nature and form of the decree to be entered in the cause. No deficiency judgment will be allowed. The trustees under the mortgages are not the owners of the debts secured by those instruments, within the meaning of federal equity rule 10, and there is no provision in the mortgages giving the trustees the right to recover such a judgment. Under these conditions, a deficiency judgment is not permissible. Brant Independent Min. Co. v. Palmer (C. C. A.) 262 Fed. 370; Lane v. Equitable Trust Co. of New York (C. C. A.) 262 Fed. 918.

[20] The property covered by the mortgages consists of both real estate and personalty, which are so intermingled and interwoven that each class of property is essential to the other in furnishing a public

service. Moreover, any segregation thereof would be detrimental to the interests of all parties to the cause. The decree, therefore, will provide for a sale of the properties without redemption. Pacific Northwest Packing Co. v. Allen, 116 Fed. 312, 54 C. C. A. 648; Continental & Commercial Trust & Savings Bank v. Corey Bros. Construction Co., 208 Fed. 976, 126 C. C. A. 64.

I have devoted much thought to the perplexing and delicate question of how the property should be offered for sale, giving due consideration, I believe, to every element entering into the problem and to the rights of all parties affected. The plan best calculated to protect the interests of all parties is probably this: The so-called Centralia plant—the property in the Western district of Washington—will be offered for sale as a separate unit; the property in Eastern Washington and Idaho, covered by the Equitable Company mortgage, will be sold as a separate unit; the property covered by the Guaranty Company mortgage will be sold as a separate unit; and then the two last-mentioned properties will be offered as an entirety, leaving it for later determination which, if any, of the bids shall be accepted and confirmed. In the event it is ultimately found desirable and proper to accept the bid for all the property in Eastern Washington and Idaho as an entirety and to confirm such a sale, suitable provision will be made at that time to protect the interests of all parties in marshaling the proceeds. In this connection I will say that the transforming substation and the constant current lines, concerning which expert testimony was offered at the trial, will be treated as excepted from the Equitable Company mortgage and included in the property covered by the Guaranty Company mortgage.

Now as to allowances to counsel and the trustees: I know counsel for the Equitable Company will understand that I have not the slightest disposition to minimize either the character or the extent of the services rendered by them in handling this important litigation; yet I cannot close my eyes to the fact that much of the work done was made necessary by the unfortunate bringing of a premature action in a court having no jurisdiction of it, and this aspect of the matter must be taken into account. Taking into consideration the services necessarily rendered in the matter, the heated character of the contest, the large amount involved, and the result attained, I have concluded that an allowance to them of $22,500 will be fair and reasonable compensation. The Equitable Company will be allowed as compensation for its services as trustee $2,500. Counsel for the Guaranty Company will be allowed $9,000, and that company, for its services as trustee, will be allowed $1,000. The matter of an additional allowance to the receivers will be postponed until the submission of their final account.

Counsel for the State Bank of Portland and for D. G. Lebb are tardy in the submission of briefs; hence those matters will be disposed of later in a separate memorandum.

A decree making effective the conclusions announced in this memorandum will be entered in due course.